**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 11/1/12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  11-cr-06-01-JL
           v.                   *  April 5, 2012
                                *  2:55 p.m.
BRIAN MAHONEY                    *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF COMPETENCY HEARING
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:

For the Government:   Arnold Huftalen, AUSA
                      U.S. Attorney's Office
                      53 Pleasant Street
                      Concord, NH 03301

For the Defendant:    Paul Garrity, Esq.
                      14 Londonderry Road
                      Londonderry, NH  03053

Also present:         Andrew Schulman, Esq.

Probation Officer:    Jodi Gauvin

Court Reporter:       Sandra L. Bailey, LCR, CM, CRR
                      Official Court Reporter
                      United States District Court
                      55 Pleasant Street
                      Concord, NH  03301
                      (603)225-1454

2

1                          I N D E X

2

3    Witness              Direct   Cross   Redirect   Recross

4
     MIRIAM KISSIN
5
     By Mr. Huftalen        5
6    By Mr. Garrity                  50

7
     ERIC MART
8
     By Mr. Garrity        83
9    By Mr. Huftalen                111

10

11

12

13

14

15
     Exhibits                              ID        Evid.
16
     Government's Exhibit No. 2                         6
17   Government's Exhibit Nos. 1 thru 7                 7

18

19

20

21

22

23

24

25

1                    BEFORE THE COURT

2             THE CLERK:  The court has before it for

3    consideration this afternoon a competency hearing in

4    Criminal Case 11-cr-6-01-JL, United States of America

5    versus Brian Mahoney.

6             Dr. Kissin, can you hear me?

7             THE WITNESS:  Yes, I can.

8             THE CLERK:  I'd like to swear you in.  If you

9    could stand please and please raise your right hand.

10                    MIRIAM KISSIN

11       having been duly sworn, testified as follows:

12             THE CLERK:  And for the record, please state

13   your full name and spell your last name.

14             THE WITNESS:  It's Dr. Miriam Kissin,

15   K-I-S-S-I-N.

16             THE COURT:  Doctor, this is Joe Laplante.  I'm

17   the presiding judge in this hearing.

18             THE WITNESS:  Good afternoon.

19             THE COURT:  We will proceed with your

20   examination in a moment because I'm going to let the

21   prosecution present its case first on competency.

22             Before we get started, two housekeeping

23   issues.  One is, Charli, I'm going to be appointing

24   under the CJA co-counsel for Mr. Mahoney.  It will be

25   Attorney Schulman.  He's here in court today and as of

1  this hearing he's appointed.  I'll issue an order with

2  some specifics on that after the hearing.  I want to

3  make sure we're as protective of Mr. Mahoney's rights as

4  we possibly can be in this case because there are issues

5  on two levels.  One, his competency; and two, a

6  potential conflict of interest issue involving Mr.

7  Garrity.  I don't know what -- I'm told that Mr. Mahoney

8  has withdrawn or plans to withdraw his ethical complaint

9  against Mr. Garrity, but to make sure he's fully

10  protected I have Attorney Schulman here, and I don't

11  think there's any issues at all with respect to Attorney

12  Schulman.

13         And the only other housekeeping issue is this.

14  I'm in the middle of a jury trial and the jury is

15  deliberating, so there's a possibility we could be

16  interrupted during this hearing based on either a jury

17  question or a verdict.  If that happens, I'll have to

18  suspend these proceedings and go across the hall and

19  conduct those and then return hopefully as soon as

20  possible.

21         All right, are we ready to proceed?

22         MR. HUFTALEN:  Yes, your Honor.

23         THE COURT:  Please proceed.  Why don't you

24  identify yourself for the record.

25         MR. HUFTALEN:  Arnold Huftalen, Assistant U.S.

1    Attorney for the government.

2                    DIRECT EXAMINATION

3                    VIA VIDEOCONFERENCE

4    BY MR. HUFTALEN:

5        Q.   Dr. Kissin, can you hear me?

6        A.   Yes, I can.

7        Q.   If during the course of my questioning of you

8    you can't hear me or you don't understand the question,

9    please wave your hand so I can see it or somehow let me

10   know and I'll try to take care of the issue at that

11   point, all right?

12       A.   Okay.

13       Q.   Obviously, you're Dr. Kissin.  Would you tell

14   Judge Laplante, please, what your background, education,

15   and training are so that he can take your testimony in

16   the appropriate context.

17       A.   I'm a forensic psychologist employed by the

18   Bureau of Prisons Department of Justice.  My background,

19   I have a doctorate degree in psychology, clinical

20   psychology from Antioch University in Keene, New

21   Hampshire.  As part of my degree I had an internship at

22   Bellevue Hospital/NYUMedical Center in New York.  That

23   was both general and forensic training.  In addition I

24   have a post-doctorate from the University of

25   Massachusetts Medical Center, the Law and Psychiatry

1    Program where I trained post-doc level.  Prior to being

2    employed by the Bureau of Prisons I worked for the

3    Massachusetts Trial Court System as a forensic

4    psychologist attached to the court.

5         Q.   Dr. Kissin, I marked a copy of your CV as

6    Government Exhibit 2, and your Honor, I've given a copy

7    to defense counsel.  I request that it be accepted by

8    the court as Exhibit 2.

9              MR. GARRITY:  No objection, judge.

10             THE COURT:  It's admitted.

11             (Government's Exhibit 2 admitted.)

12        Q.   Dr. Kissin, as you know, you're here to

13   testify concerning the competence of Mr. Brian Mahoney

14   --

15             THE COURT:  Why don't you cut through one

16   thing.  You've premarked a number of exhibits, right?

17             MR. HUFTALEN:  I have.

18             THE COURT:  They are numbered what, 1

19   through --

20             MR. HUFTALEN:  1 through 7.

21             THE COURT:  Are there any objections to any of

22   those exhibits?

23             MR. GARRITY:  No, your Honor.

24             THE COURT:  So those are all admitted, 1

25   through 7.  Sorry to interrupt.

 1          (Government's Exhibits 1 thru 7

 2          admitted.)

 3          MR. HUFTALEN:   Thank you.

 4     Q.    Dr. Kissin, I understand you have another

 5   commitment and would like to finish your testimony by

 6   4 p.m. if possible.   We're going to do everything we can

 7   to make that happen.

 8     A.    Thank you.

 9     Q.    I can see from the monitor that you can see

10   me, but you can't see who else is in the courtroom.   Mr.

11   Mahoney is to my right.   He's sitting with his two

12   defense attorneys.   As you know, Judge Laplante is in

13   the courtroom along with the deputy clerk and the

14   stenographer.   There is a representative from the

15   Probation Office and a few other security personnel.

16          You saw Mr. Mahoney at your workplace at

17   Devens in Massachusetts.   You conducted a forensic

18   evaluation of him.   You observed him over a period of

19   time and ultimately you reached an opinion concerning

20   his competence; correct?

21     A.    Yes.

22     Q.    I'm going to ask you to walk us through what

23   you did before you arrived at that opinion.   And in

24   order to do that I'd like you to tell us when it was

25   that Mr. Mahoney first came to your facility, when you

1    saw him, the context in which you saw him, how many

2    times you saw him, and we'll move on from there.

3         A.    Mr. Mahoney arrived at the Federal Medical

4    Center, Devens, on April 29th of last year, 2011.  He

5    was at the facility through June 13, 2011.

6              When he first arrived I was the person that

7    actually did the screening.  When someone first comes in

8    they're met there by ideally the person who is going to

9    be doing the evaluation, which was the case, and that

10   after that meeting he was assigned housing.  Initially

11   everyone that comes in for a forensic evaluation goes to

12   either a locked unit if they need clearance of their PPD

13   which is basically to make sure they don't have TB, and

14   that's where Mr. Mahoney ended up.  It's a locked unit

15   not because he was unstable and have to be in a locked

16   unit, but again, for segregation purposes.  He was there

17   for several days until he moved on to our semi-locked

18   unit which is a chance for nursing staff to see him, get

19   the medical evaluations done, which is the procedure for

20   everyone, and it was in there after he was in the open

21   unit, meaning in the housing unit in our psychiatric

22   hospital center which is where all forensic studies go

23   to unless they need a higher level of care, so it's just

24   a general dormitory -- I'm sorry, with cell type of

25   unit.

1               I met with Mr. Mahoney for meetings in my

2       office, so basically he was asked to come for scheduled

3       appointments, which he was able to do.  I met with him

4       altogether, including the screening and one other

5       occasion when he was in the locked unit, seven times.

6       Some of those meetings were longer than other meetings.

7       Approximately an hour to two hours each meeting.  And in

8       the course of those meetings I got a history from Mr.

9       Mahoney.  I also inquired each time with regard to how

10      he was doing at the moment in the institution, and I

11      also conducted an evaluation regarding his competency.

12              Also in the course of the time that he was

13      here I had access to speak to different other

14      individuals that saw Mr. Mahoney.  That would be our

15      psychiatry staff that provided treatment of Mr. Mahoney

16      while he was here as well as the nursing staff that were

17      involved more when he was more on a locked unit than the

18      open unit, once you're in the open unit it's on an as

19      needed basis for the nursing staff, and also the custody

20      staff, such as the officers, lieutenants and such that

21      have day-to-day contact with the inmates at the

22      institution.

23      Q.    Thank you very much.  Now, you prepared a

24      forensic evaluation, forensic report in this case and

25      that's been marked as Exhibit Number 1.  The court has a

1   copy, I have a copy, Mr. Garrity has a copy, and I

2   assume you have a copy with you; correct?

3       A.   Yes.

4       Q.   In the course of your testimony, if you need

5   to refer to that report, please feel free to do so.  But

6   if you're referring to something specifically in the

7   report, please identify what it is you're referring to

8   so we all know what you're looking at.

9          Now, I'm not going to walk you through your

10   entire report.  The court has already read the report.

11   We don't need to duplicate that testimony orally, but

12   there are some things that are listed in the report that

13   I what you to put on the record so that the record is

14   clear about what it is that you base your opinion on,

15   okay?

16       A.   Yes.

17       Q.   Could you tell us what background information

18   you received with respect to Mr. Mahoney and how that

19   came to your attention.  And by that I mean did he give

20   information about himself, did you review records that

21   were provided to you.  And I don't need you to tell us

22   what all the records are because they are listed in the

23   report.

24       A.   Oh, yes, I'm just referring to the report.

25   So, there is information from Mr. Mahoney's self-report

1  about himself as well as some records from previous

2  places where he was detained, he was in custody, as well

3  as community treatment centers.  So clinical notes from

4  treatment he received in the community.

5      Q.    What did you learn about Mr. Mahoney's

6  developmental history?

7      A.    There was nothing particularly significant in

8  the developmental history in terms of serious events.  I

9  believe in terms of his own maturation, however, it does

10  appear that there's some chaos in the family, that there

11  was domestic violence, he also had a father who was

12  incarcerated for much of his life, so there is some

13  instability in his background.  Other than that he did

14  also have some positive experiences growing up.  He

15  appeared to be particularly close to his mother.  He did

16  talk about himself being quite hyper throughout much of

17  his childhood, having some accidents because of his

18  hyperness, and he thought that was significant,

19  continued throughout much of his life.

20      Q.    Let me stop you right there.  We're going to

21  talk more about that hyperness later.  But did he

22  present to you consistent with having had a history of

23  being hyper?

24      A.    Yes.  He was what I would describe as hyper

25  throughout much of our meetings.

ct 127   Filed 08/03/12   Page 12 of 137

Case 1:11-cr-00006-JL   Document 127   Filed 08/03/12   Page 12 of 137

12

1    Q.   Did Mr. Mahoney tell you what his educational

2    background was and did your observations confirm what he

3    was telling you about his education?

4    A.   Mr. Mahoney had some interruption in his

5    schooling originally, he dropped out of high school

6    pretty early on, however, he did complete his high

7    school education while he was incarcerated.  At some

8    point he also took some classes at I believe it was

9    Wentworth Technical Institute while he was employed

10   later on in his life.  He did not complete his degree

11   because at the time there was lucrative work available

12   because of the Big Dig Project in Boston.  He worked as

13   an iron worker.  And so he chose to take employment

14   rather than complete his studies.  But he told me that

15   he was close to an associate's level degree with the

16   various courses he had taken.

17   Q.   And did he tell you whether or not he had any

18   history of substance abuse?

19   A.   I have to refresh my recollection.  I'm sorry.

20   I believe there's no particular history of substance

21   dependence.  There has been some use in regard to some

22   drinking, but he did not report, and I believe he also

23   had a DUI charge at one occasion, but there is not a

24   report on any significant dependence on substance.

25   Q.   And were you aware of any medical issues with

1   Mr. Mahoney that impacted significantly on your

2   evaluation process?

3       A.   Not particularly that impacted on the

4   evaluation process although potentially he does have a

5   chronic pain condition as a result of an injury that he

6   had sustained when he was many years ago in the course

7   of employment, and in addition he spoke about having

8   been re-injured in the context of some dealings with

9   police officers, so he complained of pain in his ankle,

10  but it did not in my opinion interfere with his -- with

11  the matter at hand with regard to his competency.

12      Q.   And finally, what did you learn about his

13  mental health history?

14      A.   Mr. Mahoney, as I stated earlier, described

15  that he, from an early age, he was hyper in his

16  interactions.  He did appear to be functional in that he

17  was able to interact with other people.  He was able to

18  be employed for many years.  Apparently successfully.

19  However, he said that he had many interpersonal

20  difficulties with people who would be put off by his

21  mannerisms, his approach.  That he would come on very

22  strongly, he would be loud and boisterous, and he said

23  that that feedback that he got in that regard caused him

24  to seek outpatient treatment.  In the past he had

25  counseling, he had therapy, he had been on medication.

1    I believe he was on a sedative, Xanax, for a number of

2    years, and I believe he was in and out of counseling for

3    a number of years up until the time of his most recent

4    detention.

5         Q.   Now that we've established what you learned

6    about him before you conducted your evaluation, could

7    you tell us what behavioral observations you made during

8    the course of your evaluation.  Tell us about the Mr.

9    Mahoney you saw while he was at your facility?

10        A.   Mr. Mahoney was cooperative with the

11   evaluation, that he understood what my role was, what

12   the nature of the evaluation is, and what the purpose of

13   the questions that I was asking him and what those were

14   for.  He had very strong ideas and opinions about his

15   legal case and was very key on relating those ideas and

16   opinions to me.  Sometimes he would do so in kind of a

17   loud and boisterous way and express agitation because of

18   his feelings about the charges, the nature of the

19   charges against him and his legal situation.  When that

20   would become especially problematic, I would have to

21   redirect him.  I would have to ask him to calm down,

22   which he was able to do on each occasion that I asked

23   him to, but it was very clear to me that he had a lot of

24   emotional feelings about his legal situation and he

25   expressed those significantly.  But other than that he

1    was cooperative, he was able to sit with me for up to

2    two hours at a time to provide history, to provide -- to

3    answer my questions regards to the legal proceedings.

4    He also was cooperative with other staff in the

5    institution.  There was one occasion in which he got an

6    incident report, which is basically that he had some

7    type of trouble in the institution because of a rule

8    infraction.  It specifically had to do with misuse of

9    the telephone incidence.  It didn't appear to have

10   anything to do with emotional problems or personal

11   exchange with someone.  He broke their rules in the a

12   way the phone was supposed to be used.  He got locked up

13   in the locked unit for several days and then he was

14   released, and he handled that adequately.  I spoke to

15   him during that time.  He said he understood what the

16   situation was, he understood how the system works, and

17   he wasn't particularly distressed about having been

18   locked up and then released.

19        Q.   So even though he was somewhat hyper, the only

20   disciplinaries he had was the one you just referenced?

21        A.   That is correct.

22        Q.   Now, other than the back pain you spoke of,

23   were there any medical evaluations or studies performed

24   on him that we should know about?

25        A.   I believe there's general lab work that's

1   conducted on all inmates when they first come into the

2   institution.   There was nothing particularly remarkable

3   that had come up as a result of that.   And other than

4   his leg and his back pain that he complained of, there

5   wasn't any other medical problems that had come up in

6   the course of his evaluation.

7        Q.   As a result --

8        A.   I'm sorry, I believe there was, I apologize, I

9   believe there was a history of hypertension.   I'd have

10  to look carefully, but he might have been treated for

11  hypertension or there was some question whether that

12  continued, but no acute incidents occurred in the

13  institution.

14       Q.   So there were no acute medical issues that

15  related to his behavior of which you're aware; correct?

16       A.   Correct.

17       Q.   Now, because of his reported psychiatric

18  history and the exhibited mood symptoms that you

19  generally referenced, I understand that he was sent for

20  a psychiatric consult; is that correct?

21       A.   Yes, that's correct.   Also because he had a

22  history of taking psychiatric medication and that would

23  be another indicator to be seen by a psychiatrist.

24       Q.   And can you tell us what the upshot of that

25  psychiatric consult was?

1          A.   Mr. Mahoney was seen by the attending

2     psychiatrist.  All the individuals here for study are

3     assigned a psychiatrist based on their number, and he

4     was seen by a psychiatrist.  He spoke about a history of

5     being prescribed medications in the previous place where

6     he was.  I believe he took Seroquel and other

7     medication.  Based on the evaluation that the

8     psychiatrist at our institution did he was first

9     prescribed a different mood stabilizer, Oxcarbazepine,

10    Trileptal is the tradename which it's also referred to,

11    it's a mood stabilizer.  It's one that's often used.

12    And that was a medication that he remained on throughout

13    the course of his evaluation here.  In fact, at one

14    point the dosage of the medication was increased because

15    his symptoms did not remit although he did appear to be

16    somewhat calm and it was expected that he would do even

17    better if the dose were increased.  I believe the

18    increase came pretty close to the time that he was

19    released from this institution, so it's unclear how much

20    additional benefit he got from that, but the

21    psychiatrist felt that he was doing better and I would

22    agree with that in terms of ability to remain calm under

23    stressful situations.

24         Q.   And can you tell us whether or not he was

25    compliant with the medication regime while he was at

1   your facility?

2        A.    Yes.  He said he was willing to take

3   medication.  In fact, that would be the only way that he

4   would get medication given the status of this

5   institution.  He was willing to take it, he was willing

6   to accept it, and he did take the medication.

7        Q.    All right.  I'd like to now get into the

8   substance of what you did with Mr. Mahoney.  I

9   understand that there were some psychological testing

10  that you attempted with respect to him that I'll refer

11  to as the MMPI; is that correct?

12       A.    Yes, yes.

13       Q.    Can you tell us what happened there?

14       A.    The MMPI, the Minnesota Multiphasic

15  Personality Inventory II, is basically it's an

16  assessment of characterological features, personality

17  features, it also gives some information about

18  diagnostic issues such as psychiatric illnesses that

19  someone might have.  And basically the result, what it

20  consists of, it's a self-report questionnaire, it's 562

21  questions, yes or no basically that an individual

22  answers about themselves, whether something applies or

23  doesn't apply to themselves, and the various scales that

24  are embedded within the tests that provide information

25  not only about the clinical information I just spoke

1    about but also about the nature of the approach that the

2    individual takes in taking the test.  So, for example,

3    someone could be more or less honest in a way they

4    respond or they could be consistent, more or less

5    consistent in regard to responding in similar direction

6    to similar questions.  So there's various -- or they

7    could be answering questions in a way that is not

8    realistic.  So there's a number of kind of flags that

9    could be raised as a result of this test that can tell

10   you whether the way the answer vets resulted in a valid

11   protocol or invalid protocol.  And if the protocol is

12   invalid, then the results that come about, we can't

13   really interpret them clinically.  You can't really say

14   this is a good representation of their clinical status.

15   For example, if they are coming up depressed, you can't

16   really say, well, it's true that this person is

17   depressed, because there might be some question about

18   the way they approached the test.

19          So, in Mr. Mahoney's case there were several

20   of these kind of flags that were raised with regard to

21   the validity of the test.

22          The first one is that he tended to respond to

23   the question in a negative way regardless of the context

24   of the question, so basically kind of nay-saying or

25   saying no to everything.  So whether the question was

1    asked in a positive direction or negative direction he

2    would just say no.  So that kind of gave an indication

3    that overall might not be an accurate representation.

4              He also reported, again, symptoms that are

5    very rare in the population, you would only expect to

6    see them in people that are very compromised

7    psychiatrically, and to have someone that's generally

8    pretty functional that doesn't present in other settings

9    in a way that's unusual or would be unusual for them to

10   endorse this number of symptoms, it didn't coincide with

11   the behavioral observations that could be made about

12   him.  So that was another red flag that potentially

13   invalidated the instrument.

14             And the third sort of problem with the

15   approach to the test is that Mr. Mahoney tended to

16   basically deny negative things about himself around the

17   test, but not only very negative things, but also kind

18   of innocuous negative things that most people might

19   have.  So basically not saying anything negative about

20   himself, which again, raises a question of whether, how

21   honestly, how truthfully he approached the test.

22             So given all of those invalidity indicators

23   that red flags are raised on, it invalidated the entire

24   protocol so you cannot further interpret the clinical

25   information that might otherwise be derived from this

1   evaluation.

2        Q.   Now, in your experience is it unusual that

3   someone's results on the MMPI are found to be not valid?

4        A.   It's not at all unusual.  It's kind of setting

5   specific, and in a forensic setting it is more usual

6   than not that the protocol would come back invalid for

7   one or more of these type of reasons, so no, it is not

8   unusual.

9        Q.   What did you do with him?  Tell us how you

10  went about evaluating him to determine whether or not he

11  was competent other than have him take this MMPI?

12       A.   So in regard to specifically, I believe you're

13  asking me how I conducted the competency evaluation or

14  the features of the competency evaluation that I

15  conducted?

16       Q.   Yes, doctor, but let me interrupt you.  I

17  should have stopped you earlier, I apologize.  Our

18  stenographer is very good, but you're speaking very

19  quickly.  If you could slow down a little bit.

20       A.   I will definitely do that.  I apologize, it's

21  my New Yorker in me.

22            So, in regard to the competency evaluation

23  basically I use what is referred to as a structured

24  interview, and that is not a specific instrument that I

25  use, I conduct an interview that hits at various points

1   that have to do with competency-related skills.

2          So, in regard to Mr. Mahoney and anybody else

3   that I would be assessing for competency, the things

4   that I would like to know about is his understanding of

5   the charges against him, the potential implications of

6   the charges or the severity of the charges, the history

7   of the charges, why they were arrested, what came about,

8   what type of information, discovery information or

9   evidence might be available in regard to their charges,

10  their evaluation of that evidence, and that I would go

11  on from there to ask him about court proceedings and how

12  a court operates in a generic sense.  So, for any

13  defendant, what an attorney does, what a U.S. attorney

14  does, what a defense attorney does, what the judge and

15  jury's role is and all the various court personnel,

16  again in a generic manner.  I would then move on and ask

17  the defendant, and this is what I did in Mr. Mahoney's,

18  specifically in his case what his relationship is with

19  his attorney, what his history is with his attorney,

20  whether he trusts his attorney to be able to represent

21  his best interests.  Also, in regard to his particular

22  case what might be -- how it might play out in regard to

23  potentially going to trial or taking a plea and what

24  might be reasons to do one versus the other.  So, kind

25  of in a general sense what I am trying to get at is the

1    factual information about their charges, making sure the

2    defendant understands what the facts are in their

3    charges and also the rational part of it.  And the

4    rational having to do with their understanding of the

5    potential implication of their charges in regard to the

6    court case.  So how, you know, what they might be

7    facing, how significant the charges are, how they might

8    go about defending themselves, what information might be

9    necessary to share with an attorney, and then their

10   willingness to do that with their attorney.

11          And finally I would ask Mr. Mahoney about his

12   ability to make decisions based on information available

13   to him.  And that would have to do with some

14   hypothetical questions about taking a plea versus taking

15   a case to trial, both generically and in his particular

16   case, what might he consider, why he might consider one

17   direction versus another, what might make him do that.

18          So those are kind of generally the elements of

19   a competency evaluation.

20          Q.   Now, you reviewed two other reports that have

21   been prepared in this case by Dr. Mart which are marked

22   as Government's Exhibits 3 and 7.  And Dr. Mart, as you

23   know, used a tool called a MacArthur Competence

24   Assessment Tool?

25          A.   Yes.

1      Q.   I'm not going to ask you to go into detail on

2  what Dr. Mart's opinion was at this point in time, but

3  generally what is the MacArthur Assessment Tool, and do

4  you use it, and if not, why not?

5      A.   The Competence Assessment Tool - Criminal

6  Adjudication, that's kind of the general, that's the

7  full name of it, basically it's an instrument that's

8  widely used to assess competence.  It's the formal

9  instrument that hits on the elements that I spoke about

10  that are relevant to competency skills.  So, there's an

11  understanding section, and that has to do with that kind

12  of factual information that I had spoke about.  There's

13  -- the second section is the reasoning section, and that

14  has to do with being able to understand how a court

15  works but generically, so some of the personnel that are

16  involved, the different players, the different sides and

17  how they might interact, again, not about the

18  individual's own case, but how much they know about how

19  a court operates and what one might expect in a court

20  setting, and that's done through kind of hypothetical

21  questions that aren't about the person's own case.

22          And the last section is --

23      Q.   Dr. Kissin, excuse me.

24      A.   Yes.

25      Q.   I'm going to have to ask you to slow down

1   again.

2        A.   I'm sorry.

3        Q.   It's quite all right.   If you see me do this.

4   Go ahead.

5        A.   If you do that once in a while, that would

6   help me.

7             The last section is the reasoning section.

8   I'm sorry, the last section is the appreciation section,

9   and that has to do with kind of what it sounds like, a

10  person's appreciation of their own situation.  So, their

11  own case within the legal context and the implications

12  of their own case.  And that speaks to a person's

13  ability to make decisions based on information that they

14  have about their own case, their ability to work with

15  their attorney in regard to their own case.  So those

16  are the kinds of the large categories that are involved

17  in that.  And based on the scores of this instrument,

18  one can determine if someone is competent or not

19  competent.

20       Q.   Okay.  I ask you that because Dr. Mart used

21  it, and you have reviewed what is marked as Government

22  Exhibit Number 6 which is the data from Dr. Mart's use

23  of the MacArthur Competence Assessment Tool; correct?

24       A.   Yes.

25       Q.   And in sum it really looks at three things,

1    understanding is first, his reasoning is second, and

2    appreciation is third as you've described; correct?

3         A.   Yes.

4         Q.   Do you cover all of those same issues in your

5    interview process even though you don't use the

6    MacArthur Assessment Tool?

7         A.   Yes, I do.

8         Q.   I think I asked you if you used it and if you

9    don't, why not, but you didn't answer --

10        A.   Oh, I'm sorry.  I do not use the instrument,

11   this instrument or any other instrument, but I do cover

12   all of those various skills.

13             The reason I don't use an instrument is I find

14   it easier to do an interview, to kind of guide the

15   interview specific to the issues that might be relevant

16   to this particular case at hand.  So, for example, if

17   someone has specific issues related to their attorney, I

18   can ask much more questions about that, or if there are

19   other kinds of questions, other kinds of issues that a

20   person might be having, I can expand on that, and I'm

21   not pigeon-holed into a specific instrument.  However,

22   all of these issues that are covered by the MacArthur

23   are important, and I do cover all of them by asking

24   those questions though not necessarily in that format,

25   but I do speak to all those things in regard to a

1    competence opinion.

2         Q.   Okay.  As I understand you, you're not saying

3    the MacArthur Assessment Tool is an invalid tool;

4    correct?

5         A.   No, not at all.

6         Q.   But would it fair to say that you have the

7    luxury of seeing people over a long period of time and

8    can engage them in much longer conversations and

9    interviews than using the MacArthur Assessment Tool?

10        A.   I would say that yes, I do have that luxury,

11   although this tool can be used as part of an evaluation

12   that's also longer in length in observation, so it's not

13   necessarily either or.

14        Q.   Okay.  Now, I'm not going to go back and ask

15   you to tell us what your observations were with respect

16   to Mr. Mahoney on all of those questions that you talked

17   about when you were telling us that your questions went

18   to the issue of whether he understood the trial, who the

19   participants were, what his legal consequences were, but

20   please, do in a general sense, I shouldn't say in a

21   general sense, please do tell us what you observed of

22   Mr. Mahoney's ability to communicate to you his

23   understanding of the trial process, what the court

24   process is, I shouldn't limit it to trial.

25        A.   Mr. Mahoney had a very, in my opinion, had a

1  very good sophisticated understanding of the court

2  process, more sophisticated than the average person

3  would.  He told me specifically that he spent many years

4  doing legal research on his own because of his own

5  criminal case and the situation he finds himself in and

6  hoping to find a solution to that, and to do that he has

7  read legal books, I believe he's also taken some type of

8  a paralegal course that was offered at a local

9  university at some point.  So he has some reading, self-

10  teaching and also some I believe formal teaching, more

11  so than the average person that would be entering the

12  court system.  And so he had no difficulty answering

13  questions about how a court operates, what the roles of

14  the various participants might be, or any of those kind

15  of factual issues regarding the court process.

16      Q.    What did you learn about Mr. Mahoney's

17  perception of the relationship that he had with his

18  defense attorney or has with his defense attorney in

19  this case?

20      A.    Mr. Mahoney had very strong opinions about his

21  attorney, in fact this is his second attorney, he had a

22  previous attorney that he had some similar problems

23  with, and he was very upset that he had a particular

24  understanding of how his case should be adjudicated, the

25  direction his defense should go in, the type of issues

1   that should be raised in order to defend himself against

2   the charges, and he was very displeased with his

3   attorney, with Mr. Garrity, because he was not willing

4   to go along with Mr. Mahoney's ideas in regard to how to

5   defend his case.  Mr. Mahoney said that he felt he was

6   in a very good position to know what's relevant in his

7   case.  He had been, as he said, studying this case for

8   many years, living this case for many years.  He felt

9   that nobody knew the issues better than him.  And a lot

10  of time he was disparaging about Mr. Garrity, attorneys

11  in general, saying that he's not sure they can really do

12  a better job defending someone than the person

13  themselves or the person that puts in the effort like he

14  has to get information about their own case or their own

15  situation.

16          So, the crux of his displeasure was really

17  that his attorney was not willing to go in the defense

18  direction that he wished to go in.

19      Q.   Could you define delusional for us?

20      A.   Delusion is, or delusional is a clinical term.

21  It basically refers to an individual, a belief system or

22  a belief an individual holds that is false and that does

23  not change despite offering other information that

24  disputes the false belief.  So regardless of what might

25  be going on, the person continues to hold on to the

1   belief.  And there's various types of subsets of

2   delusions that people might suffer from on a clinical

3   illness.

4        Q.   In the month and a half that Mr. Mahoney was

5   at your facility, did you see evidence of delusional

6   thoughts on his part?

7        A.   I did not see any evidence in delusional

8   thoughts at the time that Mr. Mahoney was in this

9   institution.  He did not seem to have any ideas or

10  thoughts about events in the world that were generally

11  -- could be disputed by other persons without issue.

12       Q.   You understand that at least at some point in

13  time Mr. Mahoney had accused his attorney, Mr. Garrity,

14  of conspiring with the court to thwart his defense in

15  this case.  You're aware of that; right?

16       A.   Yes.

17       Q.   Did that appear to you to be delusional or

18  fact-based in Mr. Mahoney's mind?

19       A.   I believe what you're referencing is

20  information that was related to Dr. Mart by Mr. Mahoney.

21  At the time that I evaluated him he did not specifically

22  reference his concerns about his attorney and the judge,

23  so I did not see that.

24       Q.   Okay.  Could you define disordered thinking

25  for us and tell us what that phrase means in your

1   business?

2        A.   Also that is a clinical term.  That basically

3   means that the thought process the individual has is

4   somehow interrupted from reality.  So, regular thinking,

5   there's a logic flow in the thoughts that people have.

6   They take information from the external world, they make

7   certain conclusions about it, and there is some logic

8   between the information that's provided and the

9   conclusions that they made and the behavior that they

10  displayed.  Someone with disordered thinking, that

11  process is basically interrupted or disrupted by

12  psychiatric symptoms.  So what they perceive from the

13  outside world is not consensually what another viewer

14  would agree on and is not based in reality, and the

15  conclusions they draw on that are also irrational and

16  not based in reality and they display behavior based on

17  those erroneous conclusions.

18       Q.   In your observations of Mr. Mahoney did you

19  see any evidence that he was suffering from disordered

20  thinking as you've defined it?

21       A.   I did not.

22       Q.   What was the diagnosis that you came to with

23  respect to Mr. Mahoney?

24       A.   The diagnosis that I provided Mr. Mahoney was

25  Bipolar Disorder II, and that is essentially a mood

1    disorder.  The difference from a -- a bipolar disorder

2    basically means that the individual's moods kind of go

3    to two extremes.  So, from depression to mania.

4    Depression being sad, depressed.  Mania being kind of

5    elevated.  It can be unrealistically sort of joyful.  It

6    could also be agitated, angry.  Those are the two ways

7    mania can be expressed.

8            Bipolar II differs from bipolar disorder in

9    that it's kind of a subspecial level of symptoms, so

10   it's a different degree that both depressive and manic

11   symptoms are present, but they are not to the level that

12   would land somebody in a psychiatric hospital, they do

13   not usually present with psychotic symptoms where people

14   sometimes can when they are in the depths of depression

15   or in the grips of mania, but they do have expansive

16   moods.  Basically they have trouble sleeping, they have

17   problems with interpersonal relationships because of the

18   mood disorder.  There are a variety of ways that it

19   could manifest itself, but it's not as severe as a true

20   bipolar disorder.

21        Q.   In the six weeks that Mr. Mahoney was at your

22   facility did you observe any what you referred to as

23   psychotic symptoms?

24        A.   I did not.

25        Q.   You've just described Bipolar II Disorder

1  which is your Axis I diagnosis.  What else did your

2  diagnostic impression include?

3       A.   There are also features of anti-social

4  personality disorder.  Basically that is an Axis II or a

5  character personality disorder differing from Axis I in

6  that this is really just a way to conceptualize how an

7  individual interacts with the world around them and

8  people around them as opposed to some type of clinical

9  disorder that can be treated with medication, and the

10 reason not a full diagnosis was given but just features

11 of is because he did not meet the full criteria to have

12 that diagnosis.  So people with anti-social personality

13 disorder have various characteristics in the way that

14 they -- they might mistreat other people, not think

15 about the consequences of their actions, they are

16 impulsive, they tend to engage in criminal activities,

17 they tend to not hold up their end of their

18 responsibility, they may owe money, they may not pay

19 child support, and this is generally something that's

20 chronic throughout an individual's life and be an

21 important criteria that it would start at an early age,

22 so we would see juvenile arrests, we would see

23 behaviors, criminal behaviors or other kind of

24 assaultive behaviors from an early age.  And in Mr.

25 Mahoney's case, from his report or any other information

1   that's available, there's no indication that he

2   presented with these kind of problems at an early age.

3   He described himself as a generally well-behaved child

4   and young person.  It was only later in his life that he

5   started getting into trouble with the law.

6           So, the full criteria, full diagnosis did not

7   apply, but some of the features like the repeated

8   criminal acts and impulsivity did apply.  So that was

9   the other diagnosis provided.

10      Q.   Now, you're aware that Mr. Mahoney reported a

11  prior head injury many years ago; correct?

12      A.   Yes.

13      Q.   Did it appear to you that that head injury was

14  related to the rapid speech and the manic behaviors that

15  you witnessed?

16      A.   From the report that he gave there did not --

17  the head injury did not appear to be a time when any of

18  those things appeared in that he described having these

19  kind of problems throughout his life.  And he did not

20  describe any particular changes in behavior or his

21  ability to think or do things or remember based on the

22  head injury, so there was no indication that that was

23  driving the particular symptoms.  You also would not see

24  these type of symptoms related to a head injury.  You

25  would see a different kind of constellation of symptoms.

1     Q.    Now, Dr. Kissin, let me state this.  It's been

2     noted of Mr. Mahoney that he has rapid speech and he has

3     difficulty remaining on task.  That is consistent with

4     your observations; correct?

5     A.    Yes.

6     Q.    And do you associate those with his mood

7     disorders?

8     A.    Yes, I do.

9     Q.    And if he is appropriately medicated did he

10    appear to you to be able to control those issues, his

11    manic behavior and his rapid speech and staying on task?

12    A.    I would characterize Mr. Mahoney's behavior

13    even on medication as, his presentation as someone

14    hypomanic, which is again, sort of a self-threshold of

15    mania.  So somewhat fed up, somewhat pressured, somewhat

16    loud, but not to the point that he could not be

17    redirected and not to the point that it really

18    interfered with his ability to get things done, to

19    finish a conversation, complete an interview.  So things

20    are better with medication, but I would say that this

21    chronic mood disorder that Mr. Mahoney has, that its

22    symptomatic or to some degree, despite so far, any of

23    the medications that he has been on.

24    Q.    Your observations of these symptoms, would it

25    be fair to say that in Mr. Mahoney or in anyone who is

1   similarly situated, if he were not to take his

2   medications they could be exacerbated?

3       A.   Certainly, that's true.  Mood disorders

4   respond well to medication.  They also tend to --

5   symptoms tend to come back, sometimes even more

6   significantly than before when treatment ceases.  So,

7   you would expect exacerbation of symptoms if you take

8   away treatment.

9       Q.   Now Dr. Kissin, before I ask you for an

10  opinion with respect to Mr. Mahoney's competence I want

11  to go back to something I should have asked you in the

12  beginning.  Can you tell me how many forensic

13  examinations or evaluations you've conducted in your

14  professional career, not only with the Bureau of

15  Prisons, but inclusive of all your professional

16  experience?

17      A.   Several hundred.

18      Q.   And can you tell us whether or not the vast

19  majority of those evaluations led to an opinion on your

20  part that the person was in fact competent?

21      A.   That is correct.  The vast majority of my

22  opinion was that the person was competent.  I did these

23  evaluations in different settings and some of the

24  settings have subsets of individuals that are more or

25  less likely, but for the most part the overwhelming,

1  overwhelming majority where I would opine that they were

2  competent.

3      Q.   Do you know if that overwhelming majority is

4  unique to you or whether it's consistent with others who

5  practice in the area where you practice?

6      A.   It's consistent with others that, in my

7  immediate location as well as anywhere else that I

8  practice, and that's my understanding in the field as

9  well.

10     Q.   As a layperson, I'll ask, why is it that a

11  vast majority are found to be competent in your opinion?

12     A.   It is a -- in regards to the criteria for

13  competence it's a pretty high bar to be found

14  incompetent in that the skills that are necessary are

15  pretty basic skills, and to not have those skills

16  someone would have to be quite disordered, would have to

17  be very psychiatrically ill to present in a way that

18  they lack those skills.  Even people with mental illness

19  generally do have the skills associated with competency.

20  They would have to be so exacerbated and so symptomatic,

21  and most of the time it has to do with a psychotic

22  disorder such as schizophrenia or a very severe mood

23  disorder that would lead someone to be incompetent.  And

24  so those are rare disorders in general and even rarer to

25  be very symptomatic in those, and that is the reason why

1   primarily most people would be found competent.

2        Q.   Now, you are aware, Dr. Kissin, that there's a

3   legal definition for competence; correct?

4        A.   Yes.

5        Q.   You deal with that on a fairly regular basis;

6   is that right?

7        A.   Yes.

8        Q.   Well, let me ask you this opinion.  Based upon

9   your observations of Mr. Mahoney and everything that

10   you've told us about concerning your experience and your

11   education and training, do you have an opinion whether

12   at the time you saw Mr. Mahoney and at the time you

13   issued your forensic report, whether he had sufficient

14   capability to consult with his lawyer with a reasonable

15   degree of rational understanding.  And the second half

16   of that question is, whether he had a rational as well

17   as factual understanding of the proceedings against him.

18   Can you answer those two questions?

19        A.   Yes.

20        Q.   Please do.

21        A.   I did believe that he -- I'm sorry?

22        Q.   Please do.

23        A.   I do believe that at the time that I evaluated

24   him he did have the capacity to appreciate the charges

25   against him, consult with his attorney and make

1   decisions in his case.

2        Q.   Now, I know that you met with him over the

3   course of six weeks and there are thousands if not tens

4   of thousands of facts that you relied upon, but are

5   there any significant facts that helped inform those

6   opinions of which you have not testified today that

7   Judge Laplante should hear?

8        A.   The bigger issue in regard to the referral

9   that was made for Mr. Mahoney, on information that I

10  received from his attorney at the time that he came in

11  to the institution, there was concern whether or not he

12  really understands the issues, the charges against him,

13  whether he had some type of delusional ideas about the

14  charges against him.  In addition, whether he could be

15  calm enough to be able to address those in a court.  And

16  so those were the main questions for me when I evaluated

17  Mr. Mahoney, those were the significant concerns.

18            In regard to his ability to comport himself,

19  as I testified earlier, he was able to do that better

20  with medication, but in my opinion he was sufficiently

21  able to do that based on my interaction with him.

22            And in regard to the nature of his

23  understanding of the charges, ultimately what it came

24  down to, it appeared to be a different interpretation of

25  the law than his attorney had or perhaps that other

1   people have, but his ideas were not -- did not appear to

2   be bizarre in regard to the charges.  They appeared to

3   be plausible in nature and reality based in regard to my

4   conversation with his attorney and yourself, the

5   conversations that we had in regard to the evidence

6   against him and the information available to the

7   government against him.  So those -- I relied on that

8   significantly to be able to make a determination of his

9   thought process and whether it was delusional or

10  disordered, and I did not find either one to be the

11  case.

12        Q.    Dr. Kissin, you may or may not know but Dr.

13  Mart is going to testify when your testimony concludes,

14  and if you were in the courtroom today, I probably would

15  wait until Dr. Mart testified and then asked to recall

16  you to ask a few questions, but because you're on

17  videoconference and because we have some time

18  constraints, with the court's indulgence I'm going to

19  ask you a couple questions about Dr. Mart's two reports

20  which you have reviewed, correct, Government's Exhibit 3

21  and 5?

22        A.    Certainly.

23        Q.    Now, Dr. Mart will certainly testify about his

24  reports, but based upon your review of his reports, does

25  it appear that you and Dr. Mart agree with respect to

1  the observations of Mr. Mahoney's behavioral

2  characteristics?

3      A.   For the most part in regard to the way things

4  come across interpersonally I would say that the

5  descriptions that were provided were pretty consistent,

6  more or less depending on the day, that I experienced

7  with Mr. Mahoney.

8      Q.   And would it be fair to say, generally

9  speaking, where you and Dr. Mart diverge and go off in

10  different directions on your opinion is that Dr. Mart

11  not only is of the opinion that Mr. Mahoney is

12  incompetent, but he also writes in his report that he

13  saw psychotic traits and that he saw evidence of

14  delusional thought; is that right?

15     A.   Yes.  Dr. Mart's diagnosis is a bipolar

16  disorder, sort of a higher intensity and degree

17  diagnosis than the Bipolar Disorder II that I provided.

18  And in addition he provides a diagnosis of psychotic

19  features which has to do with a psychotic disorder which

20  I did not see supporting data for in my evaluation.

21     Q.   I want to come back around to what you

22  testified to earlier concerning the MacArthur Assessment

23  Tool, and we all recall that you said that there were

24  three basic components to it.  The first was

25  understanding, the second was reasoning, and third was

1    appreciation.  As you read Dr. Mart's reports, is his

2    opinion divergent from yours primarily based upon that

3    third aspect, appreciation, within the MacArthur

4    Assessment Tool?

5         A.   Yes, that appears to be the case.

6         Q.   Could you tell us your understanding of how

7    things are scored under that third area, the

8    appreciation?

9         A.   So there's basically three possible scores

10   that an individual can receive under the appreciation

11   section, and there's a criteria for the score.  The

12   higher the score the better.  So if you could score a

13   two or one or zero, a two is desirable, one less so and

14   zero undesirable, and basically the criteria for getting

15   a two is that the answer given is clearly plausible,

16   that it's quite possible that there doesn't seem to be

17   any problems with the person's thinking when answering

18   the question.  To get a score of a one, there is some

19   question about the plausibility of the answer given.  So

20   where it may not be completely unrealistic or plausible,

21   it's questionable.  And to score zero is getting no

22   credit for the particular question, one of two things of

23   the criteria has to be met.  Either the reply is

24   completely off base or no reply is given or no

25   explanation is given for a strange reply.  So, you can

1   see something like that of a person that is very

2   mentally ill, is very disorganized, might be speaking

3   off topic and really have nothing to do with the

4   evaluation or can't really explain why they are thinking

5   the way they are thinking.

6            And another way you can get a zero score is if

7   it's very clear that the answer that's given is not

8   probable, not plausible, and basically premised on a

9   delusional idea, so that the person has to be delusional

10  in their thinking or they have to be distorting reality,

11  and that's another way that you could get zero credit

12  on.

13       Q.   In preparation for your testimony I asked you

14  to explain to me why it is or how it was that Dr. Mart

15  came to the conclusion that Mr. Mahoney was not

16  competent and was in fact delusional; correct?

17       A.   Yes.

18       Q.   In response to that question you told me it

19  would be helpful if you had the underlying data with

20  respect to the MacArthur Assessment Tool, and we

21  provided that to you; correct?

22       A.   Yes.

23       Q.   All right, that's what's been marked as

24  Government Exhibit Number 6.  I'd like to make specific

25  reference to a few pages in that exhibit, and although

44

1    the page numbering is quite faint in the bottom right

2    and bottom left corner of successive pages, I would like

3    to direct your attention to page 37 which has the

4    heading at the top of the page, Appreciation Item 17.

5         A.   Yes.

6         Q.   Could you tell us what you see there and tell

7    us what that means to you?

8         A.   Yes.  So this is a question that, the section

9    has to do with questions about the individual's own

10   legal case.  This particular question has to do with how

11   likely the individual assesses that they are going to be

12   treated fairly within the legal system and there's a

13   likely scale type of answer.  So more likely, less

14   likely, or just as likely.  It's an opinion and that's

15   important when you ask the question to try to understand

16   the reasoning for the person's opinion.

17        Q.   And Mr. Mahoney circled just as likely;

18   correct?

19        A.   Well, it would be Dr. Mart that would circle,

20   this would be something that he would administer and

21   score himself.  So that would be a -- the answer to that

22   was provided by Mr. Mahoney.

23        Q.   Okay.  And does it appear that Mr. Mahoney

24   provided more of an answer than just as likely?  When

25   asked what are the reasons for thinking that, what does

1   this document reflect Mr. Mahoney said?

2        A.   So based on the information that's here it

3   appears that he was asked the reason for his response,

4   which is what you're meant to do on this instrument, and

5   there were some notes provided by Dr. Mart.  The first

6   word I cannot make out, but other than that it appears

7   that he stated that in the federal court system that the

8   court has to go by the Federal Rules of Evidence and

9   that he would be given the benefit of the doubt.  So

10  basically that supported his answer he would be just as

11  likely to be treated fairly as anybody else.

12       Q.   And that factual statement that in the federal

13  court system you have to go by the Federal Rules of

14  Evidence or FRE, does that appear to you to be a

15  delusional statement or a perfectly plausible statement?

16       A.   It appeared to me to be a plausible statement

17  and probably a factual statement.

18       Q.   And if you were giving this assessment or this

19  test, would you have given a score of one to that answer

20  out of those two answers?

21       A.   Okay, given just what is written here and that

22  is all the data that I have available, but if no other

23  information was provided, I wouldn't see a reason why

24  that would be a questionable response or a question

25  whether there was some delusional aspect to their

1  response.

2       Q.   I would like to very quickly direct your

3  attention to just a couple more questions.   In

4  particular page 39 which has the heading Appreciation

5  Item Number 18.  Can you tell us what you see, what's

6  reflected in the answers Mr. Mahoney apparently gave and

7  what that tells you?

8       A.   This is a question about how likely the --

9  basically it says do you think that your lawyer is going

10  to help you more or less or the same as lawyers help

11  other people in other cases, and Mr. Mahoney appears to

12  have answered less, that's what's circled, and the

13  reason for his response that was provided in the notes

14  here, he speaks about the judge on the case, Judge

15  Laplante, that he believes the judge gave him an

16  attorney but not a very good attorney, that that was the

17  judge's reasoning, and he also references some other

18  case that he believes the judge had been on where the

19  defendant in that case had a problem.  Some of this

20  information I'm getting out of Dr. Mart's report because

21  he references questions, so there's a little bit more

22  data in his report about this answer than actually is

23  written down here, but those are the things that he's

24  referencing.  So another case that he's aware of that

25  the judge and his attorney had dealings together and

1    that it was unfair.

2         Q.   Dr. Mart ascribed to that question and answer

3    a score of zero; right?

4         A.   Correct.

5         Q.   And a score of zero would be indicative of

6    clearly implausible or appear to be based on a

7    distortion of reality; right?

8         A.   Correct.

9         Q.   Does that statement as written appear to you

10   to be completely implausible or does it more likely look

11   like someone's interpretation of a factual scenario that

12   perhaps they misunderstood?

13        A.   It certainly could be -- it certainly could be

14   events in the world that were factual.  I would need

15   more information.  There is nothing specifically in the

16   statement that appears to be delusional unless there was

17   some other information offered by Mr. Mahoney that was

18   different than this.

19        Q.   I'd like you to look at one more which is page

20   41, Appreciation Item 19, if you wouldn't mind taking a

21   look at that and what you see?

22        A.   So this asks the defendant about how likely

23   are they to share information that they see relevant to

24   their case with their attorney, more or less likely than

25   other people.  And Mr. Mahoney answered that he's more

1    likely to share information with his attorney than other

2    people.  And the reasoning that he provided is that he

3    said he in fact shared everything with his attorney and

4    even though he had some doubts, but he decided to share

5    everything, and he felt that he sold him out.  He said

6    that he's done nothing more than had sold him out.

7         Q.   And again, the score ascribed by Dr. Mart as a

8    zero, reflective in your words of being clearly

9    implausible or based on distorted reality; right?

10        A.   Correct.

11        Q.   Is there anything in those answers that jump

12   out at you that cause you to believe it's clearly

13   implausible or based on distorted reality?

14        A.   Well, the phrase selling out, there could be a

15   lot of reasons why someone might feel that way.  It

16   could range from actually feeling there is some

17   conspiracy specific to that person which would fall in

18   the delusional sector or they feel that the attorney is

19   not doing a good enough job, or that they are not doing

20   the type of things that they would like them to do, not

21   filing motions, a variety of things.  I would need more

22   information but in regard to what is written, just the

23   data that's here, in my opinion there is not information

24   that speaks to distortion of reality or delusions.

25        Q.   In your experience have you talked with

1   criminal defendants in this process who were unhappy

2   with their lawyers and perhaps felt the lawyers sold

3   them out?

4        A.   I would say that the phrase selling out is a

5   phrase that I hear often and it's certainly a trigger

6   for me to ask further questions to understand what the

7   nature of the relationship really is and why they would

8   feel that way about their attorney.

9        Q.   But is it fair to say that that does not

10  trigger in you the thought that this is delusional

11  thought?

12       A.   No, certainly not automatically unless some

13  other information is provided that would lead me to it,

14  but not that phrase in and of itself.

15            MR. HUFTALEN:  Thank you very much, Dr.

16  Kissin.

17            THE WITNESS:  Thank you.

18            THE COURT:  One question before the cross

19  starts.  The question about, Attorney Huftalen, you

20  questioned the witness about the defendant's belief that

21  his counsel was in a conspiracy against him involving

22  the court, and you were addressing that in the context

23  of delusional thought.  That's not referenced in this

24  witness's report.  That's because it didn't come up with

25  this witness, right?

1          MR. HUFTALEN:  Correct.  And she corrected me

2     and pointed out that she was referring to Dr. Mart's

3     report where he raised the issue and she had read that

4     report.

5          THE COURT:  That's what I thought.  I just

6     want to make sure I understood.  Got it.  Okay, I am

7     clear.

8          MR. HUFTALEN:  Thank you.

9                    CROSS-EXAMINATION

10    BY MR. GARRITY:

11        Q.   Good afternoon, Dr. Kissin.

12        A.   Good afternoon.

13        Q.   I'm Paul Garrity and I represent Brian

14    Mahoney.  I just want to follow-up on something you said

15    near the end of your testimony.

16             You talked about conspiracy, if there was talk

17    of a conspiracy that would fall into a delusional

18    factor.  Did I mishear you?

19        A.   I'm sorry, I'm not sure what you're asking.

20    Can you please repeat that?

21        Q.   Sure.  I thought you said near the end of your

22    testimony if Mr. Mahoney or someone in Mr. Mahoney's

23    position believed that there was a conspiracy with his

24    attorney with someone else, that would fall into what

25    you thought would be delusional type thinking?

1        A.    Oh, I'm sorry, yes, I believe I said that if

2   he believed that he was being targeted in a specific

3   way, something about his own characteristics, then that

4   could certainly be indicative of a conspiracy.  You

5   would have to ask another question -- sorry, delusional

6   disorder, you would need other information, but that

7   could be information that would be for me to question

8   that.

9        Q.    So if Mr. Mahoney or someone in his position

10  thought that there was a conspiracy with his defense

11  attorney targeting him, that would raise questions in

12  your mind of delusional type thinking.  Do I understand

13  you correctly?

14       A.    A question about whether, if he believed that

15  he was being targeted or anybody else, that could raise

16  that question for me, yes.

17       Q.    And delusional type thinking could raise a

18  question in your mind with respect to that individual's

19  competency to stand trial; is that right?

20       A.    If the delusion is specifically related to the

21  issues related to their charges it can absolutely be

22  bearing on competency, yes.

23       Q.    And in your report, near the end of your

24  report, it's on the last page, you referenced when

25  talking about Mr. Mahoney's ability to consult on a

1    rational basis with his counsel, you came to the

2    conclusion basically at the end that he was able to

3    consult with counsel; is that right?

4         A.   I came to the conclusion that he had the

5    capacity to consult with counsel, yes.

6         Q.   But you also indicate in your report that he

7    did not express at that time when you wrote the report

8    last year, that he did not express any particular

9    concern that his attorney means to harm him in the

10   context of some type of conceived conspiracy?

11        A.   I'm sorry, I'm having a little bit of trouble

12   hearing you.

13        Q.   Sure.

14        A.   Maybe --

15        Q.   Can you hear me better now?

16        A.   Yes, yes, thank you.

17        Q.   At the end of your report, the second last

18   paragraph on the last page.

19        A.   Yes.

20        Q.   Do you have it there?

21        A.   Yes.

22        Q.   You talked about how myself and Mr. Mahoney

23   had apparent divergent views regarding the case against

24   him?

25        A.   Yes.

1      Q.    And you went on to say, however, he did not

2    express any particular concern that his attorney means

3    to harm him in the context of some type of conceived

4    conspiracy.

5      A.    Correct.

6      Q.    So obviously, if I read that correctly, if he

7    did conceive that there was some sort of conspiracy

8    against him, that could impact on his ability to

9    rationally consult with his attorney?

10     A.    That would be something that I would have to

11   inquire.  If he did think it was a conspiracy, I would

12   certainly feel that that would be something to

13   investigate to see if that was relevant to competency,

14   yes.

15     Q.    And if someone in Mr. Mahoney's position

16   believed that his defense attorney was in a conspiracy

17   that was targeting him, that would lead you to a

18   conclusion that that person perhaps is not competent to

19   stand trial?

20     A.    Again, it would have to be very specific, very

21   specific to the case at hand, but if the individual

22   believed that there was a conspiracy and if the

23   information was delusional in nature and that there was

24   no factual basis to any of the issues that he thought

25   were problematic, then that could certainly undermine

1    somebody's competency.  People's definition of

2    conspiracy varies.  It could be clinical in terms of the

3    delusional idea or it could be that they might feel that

4    there are parties out there that are not looking out for

5    their best interests, and those would be different.

6              THE COURT:  You know, we're at angles on the

7    head of a pin territory with this question, aren't we?

8    Look, if anybody, delusional or not, thinks that their

9    defense counsel is involved in a conspiracy against

10   them, okay, that would seem to me to be a pretty

11   significant barrier to either, A, competency to stand

12   trial; or B, defense counsel's continued role in the

13   trial.  Whether it's delusional, just mistaken, if it's

14   a sincerely held belief by a criminal defendant that his

15   lawyer is conspiring against him, I can't imagine how it

16   would not -- how it would not dispositively impact his

17   relationship with his counsel.  I mean, how would

18   anybody be able to proceed through a trial in that

19   situation?  So, you know, we can, we can go through DSM

20   all day on this.  It doesn't seem to me to be a

21   difficult question.  If he's of that belief, it

22   certainly impacts -- now, there's the question of

23   whether it's delusional necessarily, and then even

24   whether it is or not, whether it impacts the

25   relationship between defendant and counsel in a way that

```
 1   is just unworkable for trial, does anybody here disagree
 2   with that?  Anybody?
 3            MR. HUFTALEN:  No.
 4            MR. GARRITY:  No, your Honor.
 5            THE COURT:  Doctor, do you agree with that?
 6            THE WITNESS:  I think the reason that I was
 7   sort of qualifying it is because the issue of
 8   competency, the first criteria question is mental
 9   illness.  So if mental illness is not the reasoning for
10   it, then it stops being a competency issue.  Obviously
11   it could be very relevant to the court.  What would be
12   relevant to me is whether it is predicated on a mental
13   illness.  And so if it's not delusional, it could be
14   problematic, it could certainly stymie the process, but
15   it would not be this type of issue that I would find as
16   a competency-related issue.  That does not make it a
17   non-issue certainly.
18            THE COURT:  Understood, understood.  I
19   understand you completely.  By the way, let me ask this
20   question of the doctor.  Look, a criminal defendant's
21   belief that his attorney is involved in a conspiracy
22   with anyone, be it the court or any other party, is not
23   self-evident or necessarily delusional, is it?  It could
24   have a base in fact under some circumstances, couldn't
25   it?
```

1            THE WITNESS:  That's correct.  Your Honor, I'm

2    having a little trouble hearing you as well.  Perhaps

3    you're not near your mike.

4            THE COURT:  Isn't it?  Am I incorrect in

5    thinking that there's -- it sounds as if people are

6    assuming, both the doctors, and maybe I'm

7    misunderstanding, that a criminal defendant's subjective

8    belief that his attorney is involved in a conspiracy

9    with his -- with someone, let's call it the court in

10   this case because that's been the allegation, that does

11   not strike me as necessarily delusional thinking; right?

12           THE WITNESS:  I would agree, yes, that is not

13   necessarily delusional thinking.

14           THE COURT:  Now, if someone was presented with

15   facts to demonstrate evidence that that's not the case

16   or if someone was not able to substantiate that

17   allegation with anything resembling facts, it might

18   exhibit delusional thinking; right?

19           THE WITNESS:  Yes.

20           THE COURT:  Okay.  I just want to make sure.

21   But we're not saying that just believing your lawyer is

22   involved in a conspiracy against you by definition makes

23   you delusional, are we?

24           THE WITNESS:  No, I would not agree with that.

25           THE COURT:  Thank you.

```
 1              THE DEFENDANT:  Your Honor, if I may just
 2    comment, if I could just ask Dr. Kissin one question
 3    because it wasn't even heard, I did speak about this
 4    competency hearing.
 5              THE COURT:  Wait, wait, wait.  Look, you have
 6    a lawyer here.
 7              THE DEFENDANT:  Right, but I also co-counsel
 8    myself, judge, so I have a right.
 9              THE COURT:  No, you don't, Mr. Mahoney.
10    That's one of the things I've been trying to get to.
11    You've expressed the desire to represent yourself,
12    right?  I've been trying to be respectful of that desire
13    on your part, but I can't let you represent yourself
14    unless you are competent to represent yourself.  That's
15    one of the things we are doing today.  If your lawyer
16    doesn't object to you asking the question, I'll permit
17    you to do it.
18              MR. GARRITY:  Can I have one second.
19              (Defendant consulting Attorney Garrity.)
20              THE DEFENDANT:  Your Honor, I'm going to ask a
21    question if I may.
22              THE COURT:  It's up to your counsel.
23              MR. GARRITY:  That's fine, no objection.
24              THE COURT:  Okay.  I'm going to suggest to you
25    --
```

```
 1              THE DEFENDANT:  I'm --

 2              THE COURT:  Stop talking.  Listen, I'm going

 3    to suggest to you so the doctor --

 4              THE DEFENDANT:  Can I consult with co-counsel

 5    about the objection --

 6              THE COURT:  He said no objection.

 7              THE DEFENDANT:  Oh, okay.

 8              THE COURT:  He said no objection.  What I'm

 9    saying to you is if you're going to ask the doctor a

10    question, speak slowly so she can hear.

11              THE DEFENDANT:  I will.  I will, judge.  But

12    again, I want to be able to express my facts.  May I go

13    up to the mike?

14              Dr. Kissin, on page 5 of 15 of your report, if

15    you can turn to that page; please.

16              THE WITNESS:  I'm sorry, page 5 of 15?

17              THE DEFENDANT:  Page 5 of your report of 15.

18    Turn to page five, the second paragraph; please.

19              THE WITNESS:  My numbering seems to be

20    different.  I have 16 pages.

21              THE DEFENDANT:  Well, we're talking about

22    factual.  On page 15 you'll see you asked me a question,

23    Mr. Mahoney, what are you really here for?  It's on page

24    5 of 15.  And I told you that I was placed on a web page

25    for aggravated felonious sexual assault.  I said I was
```

 1    found not guilty of the Charlestown 7 gang rape, that's

 2    what brought me to you.  You told me at that point that

 3    I wanted to make a phone call and you wanted to

 4    factually make sure that that was the truth.  You called

 5    prosecutor Huftalen and I think you called my attorney,

 6    and both of my attorneys confirmed to you, as I'm

 7    confirming to this court, that I was found not guilty of

 8    aggravated felonious sexual assault Charlestown 7 gang

 9    rape, of which I'm still on the web page today, isn't

10    that correct?  Isn't that a fact?  If you want to look

11    at the report.

12            THE WITNESS:  I do recall that, yes, both

13    parties did tell me that that was defining that case.  I

14    don't recall what they said about the web page.

15            THE DEFENDANT:  All right, we're talking about

16    the conspiracy.  If you tell an attorney and if

17    prosecutor Huftalen and my own attorney both confirm at

18    that point, without my knowledge, not even knowing that

19    Mr. Mahoney was indeed acquitted of aggravated rape and

20    felonious sexual assault, isn't that factual, isn't that

21    some sort of conspiracy, because why would I be going

22    for the competency hearing when I was factually

23    acquitted of that crime?  And you made that phone call

24    and --

25            THE COURT:  Look, look, she just told you she

1  made the phone call.  She told you what the answer was

2  --

3           THE DEFENDANT:  I didn't hear it.  Is that a

4  fact, that I was acquitted, yes or no?

5           THE WITNESS:  Both parties told me that that

6  was the case for that particular charge.

7           THE DEFENDANT:  Thank you.  I wanted to make

8  the record that I was acquitted.  We're still under the

9  Fifth Amendment.  I'm talking about the Fifth Amendment,

10  judge.  I don't even have to answer these questions.  I

11  was acquitted.  I'm acquitted.  I think we know that I'm

12  not supposed to answer to the same rape charge twice.

13  The jury found me not guilty in Suffolk Superior Court.

14  Then when he said nonetheless, we're going to go, that

15  should make someone delusional, judge, yes, and make

16  someone incompetent, absolutely, and it did when I went

17  on the web page and I sued with David Hiltz who was in

18  that courtroom February 18 begging me, keep in control.

19  One thing she didn't say.  I've never, ever -- I'm a

20  danger to myself, but others or property, and to be

21  still held incompetent and violate the United States

22  Constitution under the Fifth Amendment, she just told

23  you she made a phone call.  That should have been the

24  end of that report.  I was acquitted, judge, on May 25,

25  1984, whether you like it or not, under the Fifth

1   Amendment, we're entitled under the Fifth Amendment.

2   Says no one should have to answer one question under the

3   Fifth Amendment.  And I'm still on the web page for the

4   same exact crime that I was acquitted for aggravated

5   felonious sexual assault in Massachusetts, and that

6   should be the end of this, the case should be

7   dismissed -- and file closed.  Thank you.  And that's a

8   fact.  Those are the facts, when we're talking fact of a

9   conspiracy, yes, it is a conspiracy with these two

10   gentlemen, absolutely.

11            THE COURT:  So, stop.

12            THE DEFENDANT:  Well --

13            THE COURT:  Stop.

14            THE DEFENDANT:  Okay.

15            THE COURT:  Can I ask your client a question?

16   Are you under the belief today as you sit here that your

17   defense counsel is now or ever has been involved in a

18   conspiracy against you?

19            THE DEFENDANT:  Absolutely.

20            THE COURT:  Okay.

21            THE DEFENDANT:  I'm on the web page, judge,

22   want to turn to the web page --

23            THE COURT:  I didn't ask you to explain.  I

24   just asked you --

25            THE DEFENDANT:  I was acquitted on the

```
 1   charges, your Honor, absolutely, and then Arnie said
 2   nonetheless we're going to charge you with, we're going
 3   to go back 30 years.  You can't do it under the case
 4   against the Attorney General of New Jersey, I'm sorry,
 5   those are the facts of the case.
 6           THE COURT:  You don't need to apologize to me.
 7           THE DEFENDANT:  You're looking about
 8   competence.  Obviously you know, judge, very much, and
 9   you keep, we know I'm very well competent, very much so,
10   and of course prosecutor Huftalen would agree to that.
11   I would think at this point, like I said, she had made a
12   phone call.  She asked me what are you really here for,
13   Mr. Mahoney, and I told her, I was put on a web page,
14   and I'm still on that web page for a crime I was
15   acquitted for, but then you have to go back to the Fifth
16   Amendment, and the Fifth Amendment clearly says no one
17   should ever ask you to answer to an acquittal.
18           THE COURT:  Okay.
19           THE DEFENDANT:  And that's a fact.  That's
20   factual.  And these two knew about it.  So that is a
21   conspiracy, absolutely.
22           THE COURT:  All right, I'm going to allow this
23   hearing to continue for now.  Proceed.
24       Q.  BY MR. GARRITY:  Dr. Kissin, if Mr. Mahoney --
25   well, let me ask you this.  Were you made aware of
```

1   letters that Mr. Mahoney wrote to the U.S. Attorney's

2   Office alleging a conspiracy between myself and Judge

3   Laplante, his prior attorney, his investigator, and

4   Judge DiClerico as well?

5       A.   Yes, but at the time that he came here he had

6   already written those letters and I did have access to

7   some of those letters and we did talk about that, yes.

8       Q.   Did you have those letters in your possession

9   at the time you wrote your report?

10      A.   I don't know if I had some of them, but some

11  of them were available in the court file, yes.

12      Q.   You had those letters in your report but

13  indicated in your own report that Mr. Mahoney didn't

14  express any particular concern that his attorney means

15  to harm him in the context of some type of a conceived

16  conspiracy?

17      A.   That was a direct question that I had placed

18  to Mr. Mahoney.  We discussed those letters.  I asked

19  him about those letters.  I asked him about why he wrote

20  those letters and what his concerns were.  And he

21  described his charges and concerns about the charges and

22  basically his idea of the timeline and why he should or

23  should not be charged based on his understanding of the

24  registry laws, and I inquired of him whether he believed

25  this is specifically something that you were doing to

1  him because of something personal to him or that you're

2  trying to harm him, and he specifically said, no, that

3  is not the case, he just doesn't think that you value or

4  agree with the direction of the case that he wants to go

5  in.  He thinks that that's, he believes that was not

6  professional and not appropriate, but not that it was

7  specific intent of harm that you had on him.  Now, we

8  did discuss that.  I specifically posed that question to

9  him because of the letters.

10      Q.   Well, if you were to find out that on

11  January 24th of this year he wrote to Mr. Huftalen a

12  letter where he alleges a conspiracy between Judge

13  Laplante, myself and prosecutor Huftalen, is that

14  different than what he told you during your interviews

15  of him?

16      A.   I believe the, what you're referring to, what

17  I had referenced earlier, that there was some case that

18  all the parties were involved in that he felt the

19  defendant was offered a deal and then the deal was

20  reneged and he felt like that was -- that that made all

21  the findings unethical and that probably, that would

22  translate to his case as well.  That was not anything

23  that he spoke to me about specifically, but that is

24  information I had learned from the U.S. Attorney since

25  then.  So if that's what you're talking about, yes, I'm

1    aware of that.

2         Q.   If he expanded that conspiracy to include

3    attorney Jeff Levin, an individual who wasn't involved

4    in any way with the prior case he refers to, does that

5    exhibit delusional thinking in your mind?

6         A.   I'm not sure.  I don't know what references

7    were made to Mr. Levin.  I would really have to know

8    what his thinking was and the reason for his thinking,

9    and if the reason of his thinking you could not connect

10   it to any type of reality, you could not explain why he

11   thought that that was relevant, potentially, I suppose,

12   it can be, but it's hard for me to answer without

13   knowing that information.

14        Q.   Well, if he wrote to Mr. Huftalen on

15   January 24th of this year, Arnie, Clerk Starr, Judge Joe

16   Laplante, Attorney Jeffrey Levin and Paul Garrity are

17   making sure that you will win, is that evidence of

18   delusional thinking in your mind?

19        A.   I'm sorry, I don't quite understand what you

20   read.  Can you repeat what you read?

21        Q.   Yes.  If Mr. Mahoney wrote on January 24th of

22   this year in a letter to Mr. Huftalen, Arnie, Clerk

23   Starr, Judge Joe Laplante, Attorney Jeffrey Levin and

24   Paul Garrity are making sure that you will win, is that

25   evidence of delusional thinking?

1        A.    So I think what it says is that he's

2   addressing the letter to U.S. Attorney Huftalen and he's

3   saying that the other people that he is mentioning are

4   going to make sure that he wins?

5        Q.    Right.

6        A.    Again, I would have to have an understanding

7   of what he means.  Just that sentence alone I cannot

8   make that diagnosis of delusional or not.  It can be

9   referencing something that he's not explaining very well

10  that can be reality based or it can be delusional

11  thinking.  So I need a little more information to be

12  able to make an assessment about delusional thinking of

13  that sentence.  It could be either.

14       Q.    Well, let me cut to the chase.  If he thought

15  there was an ongoing conspiracy involving me, involving

16  his attorney, that would affect his ability to consult;

17  right?

18       A.    In a general way, yes.  Again, not necessarily

19  what we spoke about, what the judge spoke about earlier

20  that it may not necessarily --

21            THE COURT:  It might not -- excuse me, excuse

22  me.  It might not involve mental illness you're saying,

23  but it certainly, even if it didn't involve mental

24  illness, could affect the attorney/client relationship

25  in a way that impacted his ability to consult?

 1              THE WITNESS:  Absolutely, absolutely.

 2       Q.    BY MR. GARRITY:  In your report you talked

 3  about Mr. Mahoney exhibiting mild grandiosity when you

 4  interacted with him?

 5       A.    Yes.

 6       Q.    Grandiosity can affect, can it not, one's

 7  ability to consult with his attorney?

 8       A.    Yes, it can, certainly.

 9       Q.    And grandiosity can affect whether or not

10  someone is competent to stand trial; is that right?

11       A.    It can, usually along with other things.  It's

12  usually not in and of itself, but it can be part of a

13  constellation of symptoms.

14       Q.    You're aware from your review of the records

15  and speaking to Mr. Mahoney that he was not an attorney;

16  is that right?

17       A.    Yes, that's my understanding, he's not an

18  attorney.

19       Q.    If you were to be made aware that Mr. Mahoney

20  called himself either an attorney or the number one pro

21  se litigant in the country, that's evidence of more than

22  mild grandiosity; is it not?

23       A.    Mr. Mahoney made, not exactly those words, but

24  he made statements about something, referenced about

25  being very knowledgeable in the law, and that is

1    grandi -- that is a grandiose statement, I'm not sure to

2    the degree of grandiosity, but I would certainly say

3    that maybe those kind of statements is grandiose in the

4    context of his life, his situation.

5         Q.   Is it fair to say that if you think you're the

6    number one pro se litigant in the country, you're not

7    going to consider advice and consultation with your

8    attorney?

9         A.   That's not what he told me at the time that I

10   evaluated him.  He said that he would in fact consider

11   at that moment standby counsel and advice from the

12   attorney, so I would say that's not necessarily the

13   case, that he or someone else in that situation

14   wouldn't.  But I would question that.  I would certainly

15   think that is a reason to question whether he would

16   consider other people's input, especially his attorneys.

17        Q.   And Mr. Mahoney, you diagnosed him with

18   bipolar disorder; is that right?

19        A.   Bipolar Disorder II.

20        Q.   And bipolar disorder involves cycling, does it

21   not?

22        A.   It can for some people.  They say primarily on

23   one part of it.  Usually for Bipolar Disorder II it's

24   more on the hypomanic side, so not so much the depressed

25   side.  Not everybody cycles quickly or often.

1       Q.   And situational stresses can affect Mr.

2   Mahoney's ability to comport himself; is that right?

3       A.   Yes.

4       Q.   Can affect his ability to comprehend and

5   understand what's going on in some ways?

6       A.   I'd say that that's not necessarily so.   It

7   can cause stress.   I'm not sure that it would

8   necessarily undermine his cognitive abilities, but

9   stress, under stress people might not be able to take in

10  information as easily or process it as easily to some

11  degree, but not understand what's going on, that might

12  be a bit.

13      Q.   When you first saw him when he first came in

14  in April of last year, he was hypomanic; is that right?

15      A.   Yes, I would describe that, yes.

16      Q.   Speaking very fast; is that correct?

17      A.   Yes, yes, at times, yes.

18      Q.   Pressured speech; is that right?

19      A.   That is the speaking fast, yes.

20      Q.   Near the end of your dealings with him at Fort

21  Devens he hadn't really improved all that much; is that

22  right?

23      A.   There was some improvement but not a complete

24  remission of his symptoms, no.

25      Q.   And that was when he was under this medication

1    you talked about, oxy -- I'm going to mangle the name.

2         A.    Oxcarbazepine.   Trileptal.

3         Q.    And because he -- and that's different than

4    Seroquel, is it not?

5         A.    It's a different medication, yes.

6         Q.    And because he had not improved much on June

7    -- by June 6th of 2011, the amount or the dosage he was

8    given of that medication was increased; was that right?

9         A.    Yes, that's correct.

10        Q.    And he was only seen for another seven days

11   after that?

12        A.    I believe so.  He then left the institution

13   after that, yes.

14              THE COURT:  All right, let's go off the record

15   for a minute.

16              (Off the record.)

17              THE COURT:  Back on the record.

18        Q.    BY MR. GARRITY:  Doctor, so his medication was

19   changed or the dosage was changed near the end; is that

20   right?

21        A.    Correct.

22        Q.    And even with this medication he only showed

23   some partial improvement while he was at your facility?

24        A.    I think we couldn't really assess the effect

25   of the increased dose because he left shortly

1    thereafter, but on the dose he was on, yes, partial

2    improvement

3         Q.    But his ability to I guess behave himself on

4    an interpersonal basis, is that something you look at

5    when determining whether or not someone was competent?

6         A.    It could certainly speak to competency if

7    that's related to his illness, it certainly can.

8         Q.    While he was at Fort Devens he was able to

9    comport himself fairly well except for that one

10   disciplinary problem; is that right?

11        A.    Yes.  And I wouldn't conceptualize that as

12   sort of comportment, that was just a breaking of the

13   rules.  Really more I assessed his interaction with me

14   and other people.

15        Q.    You're aware that now he's on Seroquel, or are

16   you?

17        A.    I believe I was told that, yes.

18        Q.    Are you aware that while on the Seroquel or

19   the Seroquel regimen he's been involved in two physical

20   confrontations or fights at his current place of

21   incarceration?

22        A.    I believe I was told that he had a fight.  I

23   don't know anything else about it, yes, I was told by

24   the U.S. Attorney that there was a fight.

25        Q.    Would that indicate to you that his ability

1   not to comport himself interpersonally at his current

2   place of incarceration, would that indicate to you that

3   even with the medication he's on now, that he has

4   difficulty rationally understanding what's going on and

5   perceiving what's going on?

6       A.   I don't think it would give me any information

7   about his ability to rationally understand or perceive.

8   It can give me information about his ability to control

9   his impulses.  Perhaps I would have to have some

10  information in the context of those fights, whether he

11  was the victim or the perpetrator, and what set him off,

12  but that wouldn't give me any information about his

13  ability to understand or be rational.

14      Q.   Okay.  That situation in terms of how he's

15  comporting himself in his current place of incarceration

16  is different than how you perceived him when he was at

17  For Devens; is that right?

18      A.   In that he didn't have any fights when he was

19  here, correct.

20      Q.   Would that indicate that he has changed in

21  some ways?

22      A.   He did report that he had a fight in a

23  facility right before coming to Fort Devens, and I

24  believe it was over something minor such as a television

25  channel if I recall correctly, so it does seem to be in

1   line with previous behaviors and not very much outside

2   previous behavior.  He was able to not do that here.

3   But he does have a history of some altercations before

4   that.

5       Q.   And you indicated during your testimony that

6   you set a fairly high bar for deciding whether or not

7   someone is competent or incompetent?

8       A.   No, I believe what I said is to -- it is -- to

9   be --

10          THE COURT:  You don't need to answer that.

11   You don't need to answer that.  I remember your

12   testimony.  You said that the bar was high under the

13   standard and you referenced that it involves mental

14   illness.  I remember your testimony.

15       Q.   When deciding that bar, whether or not someone

16   is above it or below it, you look for psychotic

17   features; is that correct?

18       A.   That can be part of the manifestation someone

19   has that would deem them incompetent.  That's certainly

20   not the only type of presentation, but it can be.

21       Q.   But psychotic features could indicate an issue

22   with respect to competency; is that right?

23       A.   I believe what I said is that is one of the

24   most typical ways that would render somebody incompetent

25   if they are suffering psychosis, yes.

1     Q.   And Dr. Mart's evaluation found some psychotic

2     features in Mr. Mahoney.  Is that what you saw in your

3     review of his report?

4     A.   His diagnosis relates that, yes.

5     Q.   And the records you reviewed, especially the

6     ones from the Goodwin Center, supported Dr. Mart's

7     finding of psychotic features, did it not?

8     A.   There were a number of diagnoses.  Some of

9     them all within the same category of mood disorder and

10    some were noted with psychotic features, some noted

11    without psychotic features, but yes, there were other

12    diagnoses consistent with that.

13    Q.   In particular did you review a report from

14    Diana Haile dated April 21st of 2010 from the Goodwin

15    Center?

16    A.   I believe that was, I'd have to look but I --

17    if you're referring to the report that Dr. Mart refers

18    to in his report?

19    Q.   Yes.

20    A.   Yes, that was included in the reference that I

21    received from the Goodwin Center.

22    Q.   So the record of Mr. Mahoney's medical

23    background did support Dr. Mart's conclusion of

24    psychotic features; is that right?

25    A.   Well, no, I'm not -- I'm not sure what you're

1    saying.  Are you asking for my independent opinion or

2    are you asking whether Dr. Haile had --

3        Q.   Dr. Haile had an opinion of psychotic

4    features.

5        A.   Yes, that does appear that Dr. Haile had that

6    opinion, yes, at that time, yes.

7        Q.   And given Mr. Mahoney's I guess propensity to

8    cycle at different occasions, is it an unfair reading of

9    his makeup and record that he can be competent on some

10   occasions and then incompetent on others?

11       A.   I think that one of the most significant

12   problems Mr. Mahoney has in regard to going forward with

13   his legal case is his ability to comport himself in

14   court, and his mood disorder can certainly affect that,

15   and if he is especially symptomatic in regard to his

16   mood disorder, it certainly can pass that threshold at

17   times.  Competence is point in time.  So it is possible

18   that he can be less or more able to comport himself and

19   be less or more in control of his mood disorder, that

20   could be to his competency, yes.

21       Q.   Did you hear Mr. Mahoney when he spoke here

22   today?

23       A.   Yes, I did.

24       Q.   Was that the way in which he conducted himself

25   when you were dealing with him?

1    A.   I think that that probably was somewhat more

2  agitated than I had seen him although there were times

3  he was agitated, I was able to redirect him at those

4  times.  He seems to have trouble settling down more so

5  than when I saw him.

6    Q.   And the way in which he conducted himself

7  today during today's hearing, does that raise a concern

8  in your mind with respect to his present competency?

9    A.   Again I, in order -- I would have to do a

10  fuller evaluation but certainly behavior like that would

11  be the type of behavior that would raise the question of

12  whether he has other capacities that are related to

13  competency, so yes, that would be a reasonable question

14  to raise.

15         MR. GARRITY:  I have no further questions.

16         THE COURT:  I just have a couple, doctor,

17  couple questions and we will let you go.

18         Certainly the behavior Mr. Mahoney exhibited

19  today would undermine your competence from a clinical

20  perspective, wouldn't it, in his ability to represent

21  himself in court on a pro se basis?

22         THE WITNESS:  I certainly defer to you on that

23  but I would certainly worry more about not having that

24  kind of moderating influence of an attorney to gather

25  his thoughts and present a reasonable coherent

1  narrative, so yes, I would think that that would be more

2  concerning than with an attorney.

3  　　　　THE COURT:  All right.  Now, just a couple

4  more questions.  A criminal defendant who believed his

5  attorney was involved in a conspiracy against his

6  interests, if that was a delusional belief, that would

7  render him, would it not, incompetent to stand trial at

8  least as represented by that attorney.  Would it not?

9  　　　　THE WITNESS:  I think certainly by that

10  attorney, and a delusional belief, a general delusional

11  belief may not necessarily be a problem if they are not

12  worried, the defendant is not worried about it in that

13  particular case, so yes, it is the case that if it's

14  just based on that attorney and that attorney goes away

15  and there's no further issue with another attorney, then

16  there may not be a competence issue.

17  　　　　THE COURT:  Sure, but a delusion that the

18  attorney with him at counsel table was involved in a

19  conspiracy against his interest, that seems to me, if

20  you disagree with me let me know, but that seems to me

21  to be a mental illness based -- mental illness based

22  manifestation of his incompetence to stand trial at

23  least as represented by that attorney; correct?

24  　　　　THE WITNESS:  Um, your Honor, I think one of

25  the reasons that I'm sort of hesitating in answering

1   your question is when -- the issue of this conspiracy

2   concerns about an attorney that have come up in my

3   evaluation, sounds like they have come up in Dr. Mart's

4   evaluation and in the courtroom, that the definition of

5   conspiracy is sort of important.  So what does it mean.

6   Is it that he believes these people are competent?  Or

7   that they don't agree with him?  That they don't value

8   his opinion?  Or that there's a specific -- that he was

9   chosen specifically to in some way be disparaged, and

10  that makes a very big difference, so both can be

11  problematic.  But when you think about, you know, mental

12  illness, it really has to be that second part, that he

13  in some way is targeted for some really strange

14  unusual -- not that he thinks he's unfairly treated or

15  unfairly charged but that the charges are not fair, both

16  are problematic, but one need not necessarily speak to

17  mental illness where the other one clearly would.

18              THE COURT:  All right.  And I have picked up

19  on this idea that there may be a language or a -- a

20  language based issue, a definitional issue of conspiracy

21  that's clouding the issue here because you're talking

22  about a conspiracy that would target him in a specific

23  way.  That type of delusion, though, of a conspiracy

24  that would target him in a deliberate way, if a

25  defendant suffered from that delusion, that would

1    certainly render him incompetent to stand trial as

2    represented by that attorney who is part of that

3    delusion; correct?

4              THE WITNESS:  Yes, and possibly just in

5    general as well as part of that court system, yes.

6              THE COURT:  Sure, especially if he had a

7    capacity to repeatedly form the least about defense

8    lawyers as being involved in those types of conspiracies

9    against him; right?

10             THE WITNESS:  Yes.

11             THE COURT:  All right, thank you.  Do you have

12   any follow-up?

13             MR. HUFTALEN:  No, we don't, thank you.

14             THE COURT:  All right, doctor, you've been

15   very patient.  I know we held you up in your personal

16   life and we apologize, but you are excused.

17             THE WITNESS:  All right, thank you very much.

18             THE COURT:  Okay.  15-minute recess.  I'll see

19   counsel.

20             (Recess taken.)

21             THE COURT:  All right, are we all prepared to

22   proceed?

23             MR. GARRITY:  Yes, your Honor.

24             THE COURT:  All right, before we start again,

25   Mr. Mahoney, I was hoping to talk to you if you let me.

1              THE DEFENDANT:  Yes, I'm sorry, but I just

2      want to get the points across, they are very crucial to

3      the case, especially being acquitted.

4              THE COURT:  Have a seat, have a seat.  By the

5      way, I've never had any doubt in my mind.  I don't think

6      any lawyer here has any doubt in their mind that you

7      were acquitted of that Charlestown 7 case.  There's no

8      question about that in anybody's mind as far as I'm

9      concerned.

10             THE DEFENDANT:  I'm still on the web stage,

11     but at the same time I was acquitted of it 29 years ago.

12             THE COURT:  Okay, so here's what I want to

13     talk to you about.

14             THE DEFENDANT:  Sure.

15             THE COURT:  You've been in court many times

16     with me now.

17             THE DEFENDANT:  I have.

18             THE COURT:  And I'll say this.  I haven't

19     always agreed with you or you with me, but I always have

20     thought we had a pretty good way of communicating with

21     each other.

22             THE DEFENDANT:  We have.  You are very

23     respectful and of course you're very, very smart.

24             THE COURT:  Well, I respect you because you're

25     a defendant in my court and you deserve my respect.

1          THE DEFENDANT:  And I try to do the best I

2     can.

3          THE COURT:  Now, that said, I've got to tell

4     you this, okay.  You were getting excited in the first

5     part of the hearing.  Listen, hear me out.

6          THE DEFENDANT:  I was.

7          THE COURT:  Hear me out.  You were getting a

8     little bit agitated, and you were starting to make a few

9     people around you a little bit nervous because you're a

10    rugged guy, right, and nobody wants, nobody wants to

11    have any kind of physical altercation over there, all

12    right?

13         THE DEFENDANT:  No, judge, I thought we had an

14    agreeable deal today.  That was the whole point.

15         THE COURT:  You can blame me for that, blame

16    me.

17         THE DEFENDANT:  Well, I know, but you can't

18    keep me forever, Judge Laplante, you're going to have to

19    let me go.

20         THE COURT:  Believe me, I want your case to be

21    processed and for you to finish your, either be

22    acquitted or finish your sentence, the sooner the better

23    because it's my obligation, even if I have to impose

24    sentence, to impose one that is not a day more severe

25    than necessary.

 1                THE DEFENDANT:  And I agree with that and

 2      today was the day that was agreed upon, that today was

 3      the day, now we're talking about stuff --

 4                THE COURT:  I know that but there's got to be

 5      three people in that agreement.  You, the prosecution

 6      and me, and I wasn't part of that agreement.

 7                THE DEFENDANT:  It was two out of three, but

 8      two out of three ain't bad.

 9                THE COURT:  Fair enough.  Now, that said,

10      though, I'm going to just ask you this.  I'm going to

11      continue with the hearing because I want to hear all the

12      evidence on competency.  I want you to do your best to

13      remain calm.

14                THE DEFENDANT:  I'm sorry.

15                THE COURT:  I don't mean to threaten you

16      but --

17                THE DEFENDANT:  No, no, not at all.

18                THE COURT:  If things get agitated over there,

19      I'm going to have to ask them to cuff you, and I don't

20      want to do that.

21                THE DEFENDANT:  No, I just get excited and

22      emotional because when you just get into the situation

23      of why we are here is because I filed a civil complaint

24      against the Department of Safety, and that's why we're

25      here.

```
 1            THE COURT:  Well --
 2            THE DEFENDANT:  That's a fact.  That's
 3   factual.  Docket number 218210E0121, that's what
 4   happened, then they come after me.
 5            THE COURT:  Are we ready to proceed?
 6            MR. GARRITY:  We are, your Honor.
 7            THE COURT:  All right.  Have you finished your
 8   case, Mr. Huftalen?
 9            MR. HUFTALEN:  Yes we have, thank you.
10            THE COURT:  Mr. Garrity, are you ready to
11   proceed?
12            MR. GARRITY:  Yes, your Honor.
13            THE COURT:  Please do.
14            MR. GARRITY:  Call Dr. Mart.
15            THE CLERK:  Please remain standing.  Please
16   raise your right hand.
17                       ERIC MART
18      having been duly sworn, testified as follows:
19            THE CLERK:  For the record, please state your
20   full name and spell your last name.
21            THE WITNESS:  Eric G. Mart, M-A-R-T.
22            THE CLERK:  Thank you, doctor, please be
23   seated.
24                   DIRECT EXAMINATION
25   BY MR. GARRITY:
```

1       Q.   Hi, Dr. Mart.  Could you give us your

2   background, educational-wise?

3       A.   Yes.  I received my bachelor's degree in

4   psychology from what's now New College of Florida, in

5   1976, and I received my doctorate in school psychology

6   from Yeshiva University in 1983.

7       Q.   And can you give us some of your work

8   experience since you received your degree?

9       A.   Well, I was initially working as a school

10   psychologist before I received my Ph.D., and so I

11   subsequently worked for several years as a school

12   psychologist in districts in New York City, also in the

13   San Francisco Bay area.  Then I did a two-year clinical

14   retraining internship in clinical psychology at the

15   Lewis Center in Cincinnati, Ohio.  Came to New

16   Hampshire, worked for Concord schools for several years,

17   and been in private practice ever since.

18       Q.   And are you a board certified forensic

19   psychologist?

20       A.   I am, through the American Board of

21   Professional Psychology.

22       Q.   And how long have you been a board certified

23   forensic psychologist?

24       A.   I believe since 2007.  I think that's correct.

25       Q.   And how many board certified forensic

1    psychologists are there in New England?

2         A.    In New England.  I -- maybe 15.  There's 200

3    nationwide about.

4         Q.    And how many in New Hampshire?

5         A.    Three.

6         Q.    And as part of your practice do you conduct

7    competency evaluations?

8         A.    I do.

9         Q.    And how many competency evaluations have you

10   done in the course of your career?

11        A.    I don't have an exact count but certainly over

12   a hundred.

13        Q.    And were you asked to conduct a competency

14   evaluation on Brian Mahoney?

15        A.    I was.

16        Q.    Can you tell us how many times you have met

17   with Mr. Mahoney when conducting evaluations?

18        A.    On three occasions.  I went up to the jail to

19   see him the first time and there was some confusion

20   about whether he felt he was comfortable proceeding.  I

21   saw him a second time on September 23rd of 2011, and

22   then I saw him again on the 27th of last month.

23        Q.    And your initial meeting with him, when was

24   that?

25        A.    September 23rd of this year -- of last year.

1    Q.   And how long was that meeting, how long did

2    that meeting last for?

3    A.   I think it was close to four hours.

4    Q.   And I'm talking about the initial one where

5    you weren't able to conduct the full evaluation.

6    A.   That was about 30 or 45 minutes I think.

7    Q.   Did you -- were you able to draw any sort of

8    conclusions or initial impressions of Mr. Mahoney from

9    that meeting?

10   A.   I thought that he, just preliminarily, I

11   thought that he seemed at that time to be hypomanic.  He

12   had, you know, pressured speech, a rapid pace of speech

13   and circumstantial tangential thoughts.

14   Q.   And after that initial meeting you went back

15   out to meet with Mr. Mahoney again, and when was that

16   second meeting?

17   A.   September 23rd of 2011.

18   Q.   And these two meetings took place at the

19   Strafford County House of Corrections?

20   A.   Yes.

21   Q.   And the second meeting with Mr. Mahoney you

22   were able to conduct a full-blown competency evaluation?

23   A.   I was.

24   Q.   Can you tell us what you did in preparation

25   for that meeting with Mr. Mahoney, what you looked at?

1         A.   I reviewed a number of psychological reports

2    including the report of Dr. Kissin and report

3    documentation from Diana Haile or Haile, I'm not sure

4    what it is, from 2010, and I also had spoken to you

5    about some of the difficulties you were having in the

6    case.

7         Q.   And can you tell us what you did during the

8    test itself when you met with Mr. Mahoney?

9         A.   I first reviewed the purpose of the

10   evaluation, limits of confidentiality, in general what I

11   was going to be doing.  And then I administered a mental

12   status examination which was the first part of the

13   assessment.

14        Q.   And can you tell us what goes into that test?

15        A.   Well, you basically take, in the course of

16   having an interview with the individual you're looking

17   at things like their content thought, their speech

18   patterns, their emotional response, any evidence of

19   disordered thinking, any evidence of cognitive

20   impairment, and also listing some history as part of

21   that.

22        Q.   And were you able to complete that test?

23        A.   I, yes, I was able, it's not really a test,

24   it's more of a procedure.

25        Q.   Were you able to complete that procedure?

1      A.   I was.   There was some difficulty in the sense

2    that he had a tendency to expand on my questions past

3    what was necessary to get the information, so it took

4    longer than it would normally take.

5      Q.   In that procedure, did you get a valid reading

6    from that procedure?

7      A.   Well, since it's based just on my

8    observations, basically what you're looking for, you're

9    just observing behavior and noting any difficulty, so it

10   would have to be valid.

11     Q.   Well, what conclusions or findings did you

12   make in that procedure?

13     A.   I noticed that he was -- he had pressured

14   speech throughout the interview.  He was alert.  Didn't

15   give any signs of distress.  He occasionally used

16   something called neologisms which are combined words

17   that he made up himself but were sometimes

18   understandable.  I will say that sometimes it was

19   difficult to take notes because the pace of his speech

20   was so fast that I couldn't really keep up.  And the

21   other problem was that he would often talk about things

22   that he appeared to believe that I -- seemed to think

23   that I had knowledge of and he would sort of just jump

24   in and start talking about some of these issues and I

25   didn't have that knowledge, you know, so sometimes I was

1   kind of lost in the process.

2       Q.   Did he exhibit any sort of delusional thinking

3   during that procedure?

4       A.   Well, he -- it was sometimes difficult to

5   tell, once again because he jumps around a lot, and, you

6   know, and can be difficult to follow.  At another point

7   in the interview he basically felt that you and several

8   other people who I don't know and the justice were

9   involved in a conspiracy against him.

10      Q.   And that conspiracy, was that in your mind

11  evidence of some sort of delusional thought process?

12      A.   Well, I thought that it was.  I thought that,

13  you know, I mean, he was telling me that you as a

14  defense attorney and the judge in his capacity as

15  prosecutor had gotten -- it was hard to follow but had

16  gotten involved in some kind of criminal conduct and he

17  was in some way the focus of the conspiracy and as a

18  result it had arranged to sort of give him

19  representation but not a very good lawyer, and that, I

20  thought that was highly improbable.

21      Q.   Did you do any other procedures when you

22  evaluated Mr. Mahoney?

23      A.   Well, I administered the instrument called the

24  Minnesota Multiphasic Personality Inventory-2 and I gave

25  him the reformulated version which is the newest

1    version.

2         Q.    And as a result of that procedure were they

3    valid?

4         A.    No, it was not possible to interpret it, but

5    not for the usual reasons.  Usually an MMPI is invalid

6    because somebody either pretends to be more virtuous and

7    better functioning than they really are.  That can

8    happen in a custody case, for example, or you're

9    applying for a job, or somebody who, for example, wants

10   to be found not guilty by reason of insanity or

11   incompetent will fake that, so they will endorse

12   ridiculous amounts of problems, but there's scales that

13   look at what the person is responding consistently to

14   either content.  So, question number three would be I am

15   very tall, true or false, and question number 67 will be

16   I am very short and he's answered true to the same

17   errors, you know, you're not paying sufficient attention

18   to either content.  So at that part, having elevated

19   scores on that will invalidate the test because the

20   person is not attempting to look good or bad, but they

21   are apparently so confused or so -- or responding so

22   idiosyncratically that they're having what's called

23   variable responses, and so that's what was happening

24   with Mr. Mahoney.  I could not interpret his MMPI.

25        Q.    Were you able to draw any conclusions even

1  though that procedure was invalid, any conclusions from

2  the MMPI?

3      A.   My conclusion was that his thinking was so

4  confused and fragmented that he was responding

5  inconsistently.  In other words, he just wasn't able to

6  focus on the test sufficiently to respond to statements.

7      Q.   And did you do another procedure when you went

8  to evaluate him?

9      A.   Yes, I used a competency interview called the

10  MacArthur Competency Interview for Criminal Adjudication

11  or MacCAT-CA.

12      Q.   Were you able to complete that procedure?

13      A.   I was.

14      Q.   What conclusions did you draw from that?

15      A.   Well, it has three sections, and basically

16  those are understanding and reasoning and appreciation.

17  And Mr. Mahoney did very well on the understanding which

18  would be what's the role of the prosecutor, what's the

19  role of the judge, you know, and also did fairly well on

20  the reasoning section, very well actually.  Had perfect

21  scores on both of them.  And that has to do with a

22  scenario where you're given two facts and you decide

23  which fact is more important in a hypothetical

24  situation, and then give your rationale for choosing

25  that fact.  So it would be more important that somebody

1   who was assaulted may have pulled a knife than it was

2   that he went to a baseball game.

3         And the last part is appreciation.  You ask

4   questions about the person's own situation like how

5   likely are you -- are you more likely or less likely or

6   just as likely to be treated fairly by the court or

7   questions like that, and he did very poorly on that and

8   had a score that fell in the clinically impaired range

9   partly because it was difficult to follow.  His answers

10  were often not on point, and in some cases seemed to

11  reflect delusional understanding of the process, of his

12  situation.

13     Q.   Just to address that portion of that test, did

14  you hear Dr. Kissin testify about some of the answers

15  that Mr. Mahoney gave on that test?

16     A.   Yes.

17     Q.   Can you address those issues that were brought

18  up during Dr. Kissin's testimony?

19     A.   Yeah.  I think -- well, what I would say first

20  of all that, you know, one of the reasons that it has

21  more than three items is that people sometimes score

22  them differently.  So there's room for, you know,

23  professionals to disagree on either a one or a zero.

24  But his score, you know, was so low on the section that

25  it wasn't, in other words, if he got three more points

1   he would still be in the clinically impaired range and,

2   you know, so I think that it's a minor difference in

3   scoring.  Also on item 18 she neglected to read the

4   first sentence of his response which was, the question

5   was do you think your lawyer will help you more or less

6   or about the same as lawyers who usually help people who

7   are in trouble, and his response was, he was involved in

8   criminal conduct with Joe Laplante, before she got into

9   I'm going to give you a lawyer but not so good a one.

10       Q.   So that was again an indication of this

11  thoughts of conspiracy?

12       A.   Yes, and that came through also in

13  conversation.

14       Q.   And what conclusions did you draw from that

15  test?

16       A.   Well, you know, the test is one of the things

17  I take into account.  I thought that he was having

18  difficulty with the appreciation of his own situation.

19  Now, the recent research on this instrument indicates

20  that the understanding and reasoning sections follow

21  along a continuum.  In other words, you could have a

22  little bit of reasoning, moderate reasoning or complete

23  understanding, but that you have appreciation of your

24  situation or you don't, and it's not something that's

25  easily fixed because you don't appreciate it.  It is

1    usually driven by very compromised cognitive abilities

2    or by thought problems.

3         Q.   So, on that continuum, where did he fall

4    again?

5         A.   He, according to my scoring, he got a one out

6    of a possible 12.

7         Q.   And that would put him in?

8         A.   The low end of the clinically significant

9    impairment range.

10        Q.   And what diagnosis did you come up with for

11   Mr. Mahoney at the end of your evaluation?

12        A.   I thought that he was suffering from bipolar

13   disorder not otherwise specified with psychotic features

14   and personality disorder not otherwise specified with

15   anti-social narcissistic features.

16        Q.   And the bipolar disorder not otherwise

17   specified with psychotic features, can you explain how

18   that can impact upon the competency determination?

19        A.   Well, it basically is a couple different

20   components in the model that I use that I adopted from

21   Thomas Rizzo, and the first thing you do is you do the

22   functional assessment.  Does the person appear to be

23   able to do what they need to do in order to stand trial.

24   And the diagnosis is just there to sort of give you the

25   why, the causal explanation.  So Mr. Smith doesn't

1  appear to understand and is not able to consult with his

2  attorney and the reason is, and that could be because

3  he's mentally ill, because he's not very smart or

4  because he's malingering, you know, would be another

5  one.  And I think that the reason that Mr. Mahoney was

6  having so much difficulty was that he was suffering from

7  a high level of manic excitement to the extent that his

8  thought processes were distorted.

9      Q.   And your conclusion of psychotic features, you

10  found support for that in the medical records you had

11  reviewed?

12      A.   In the past he has been reviewed as having

13  Bipolar I, which is much more severe and can break off

14  into psychotic features.  The bipolar disorders come in

15  a couple different flavors, and he didn't completely --

16  basically you have somebody who is in a manic state and

17  there's evidence of thought disorder.  There's a couple

18  diagnoses that might apply.  I thought that he was

19  mostly bipolar and that that was causing some thought

20  disorder and that's the diagnosis that fits best.

21      Q.   And people who have this disorder, can they

22  cycle fairly rapidly from periods of rationality to

23  periods of irrationality?

24      A.   Yes.  People who have bipolar disorder, you

25  know, sometimes they go into remission for long periods

1   of time.  Sometimes they stop being manic and become

2   depressed.  Sometimes there are some people who cycle

3   rapidly.  So you can have a good week and a bad week.

4   That would be atypical but it's something that's

5   remarked on in the literature that people cycle rapidly.

6        Q.   Were you able to draw a conclusion about

7   whether or not Mr. Mahoney cycled rapidly or not

8   rapidly?

9        A.   Well, I think that there's some indication

10  that he at times can cycle rapidly.  So, for example,

11  you and I had a phone conversation about the fact that

12  you had seen him and he seemed, very recently, and that

13  he seemed much calmer and more lucid, and I received a

14  letter from him talking about, you know, that seemed to

15  reflect a better understanding of what was going on.  I

16  think that, you know, part of the reason that there

17  might be a disagreement between myself and Dr. Kissin is

18  that I think we saw him at different stages of what was

19  going on for him.

20       Q.   The manner in which Mr. Mahoney conducted

21  himself here in the courtroom, did you witness that?

22       A.   I did.

23       Q.   If I had called you -- I talked about this

24  phone conversation we had?

25       A.   Yes.

1      Q.     Beginning of this week?

2      A.     Yes.

3      Q.     You were told about I think being calm and

4    rational and lucid?

5      A.     Right.

6      Q.     The way in which he conducted himself here in

7    court, is that consistent with that description?

8      A.     No.

9      Q.     Is that evidence of this cycling you talked

10   about?

11     A.     It could very well be, and I think it probably

12   is.  I think that he probably has a couple good days

13   sometimes, may go longer periods, may get more agitated,

14   and I think that that's evidence that that may be

15   happening.

16     Q.     And the personality disorder you diagnosed him

17   with, can you give us a brief description of what that

18   means?

19     A.     A personality disorder is a longer term sort

20   of stable pattern of problematic behavior and attitudes

21   that are more a question of personal style that's

22   extreme enough as to cause problems.  So they usually

23   don't -- people are usually not incompetent as a result

24   of personality disorders, but it can play a part in the

25   clinical picture.

1      Q.    Did you also find some delusional elements to

2    Mr. Mahoney's thinking?

3      A.    Yes.  I think that, you know, one of the --

4    well, there's delusions but there's also the problem of,

5    you know, if I'm evaluating someone, it's very unusual

6    for me to basically listen to them for 15 minutes or so,

7    not be able to get a question in, and not understand

8    what they're saying, you know, it's not that I can't

9    understand the speech, it's just that its coming very

10   rapidly, it's jumping from topic to topic.  He appears

11   to, he doesn't seem aware or sensitive to the fact that

12   he has this long sort of history with the courts and

13   that I'm not part of it, right, and so he'll mention

14   people as though I'm supposed to know who they are,

15   right, and he also has a tendency to -- he'll start

16   citing laws and talk about the various elements of his

17   case.  And I had to check back with you a couple times

18   because I was trying to find out, well, is that, what's

19   going on here exactly.  And finally, part of the problem

20   was I couldn't understand what he wanted exactly.  In

21   other words, a lot of times I will talk to people and

22   they want to be found incompetent, and whether they are

23   or they aren't because they want the case dropped.  And

24   in some cases people would want to be found competent

25   because they think they are fine and they want to

1   proceed because they think they will be innocent.  The

2   first time I talked to him his plan was that he would be

3   found competent, try the case himself because he was a,

4   such a good lawyer or, you know, could try it better

5   than anybody else, and that he would plead temporary

6   insanity because he had been driven insane by being put

7   on a web page when he shouldn't have been.  So I really

8   was sort of at a loss as to where are we going with

9   this.  What are you trying to tell me.  What are you

10  trying to accomplish.  And I just couldn't follow it.

11      Q.   Did Mr. Mahoney exhibit grandiosity when you

12  dealt with him?

13      A.   Yes.  There were comments about his ability

14  that he understood this area of the law better than

15  anyone.  There's really no lawyer that he could get that

16  would know as much about it as he does.

17      Q.   And does he, the issue of grandiosity, did

18  that in your opinion impact on the competency issue?

19      A.   I think it goes to the appreciation of his

20  situation.  So, if as part of your manic problem, your

21  manic process your grandiosity is often part of that,

22  and if you made a decision based on an unrealistic and

23  widely inflated idea of your own abilities, and that's

24  the basis for your opinion, that's not a rational

25  thought process, it's based on false premises, you know,

1  it would be like if I went down to get a job, to be on

2  the cover of GQ because I thought I was an incredibly

3  handsome man and it wasn't true, that could rise to the

4  level of being delusional.

5       Q.   At the end of I guess the evaluation process,

6  what was the conclusion you came to with respect to Mr.

7  Mahoney's competence to stand trial?

8       A.   At that time he told me that he had taken a

9  combination of medications that had helped in the past.

10  You know, I hadn't seen him previously.  And he said he

11  wasn't getting it at the jail.  And I mentioned, at the

12  time I saw him, the man as I found him I did not think

13  was competent to proceed, and, you know, the issue of

14  restoration, I thought that, well, maybe if he gets the

15  medication that he thought that he needed or, you know,

16  had another medical consultation, that that might help.

17  So that's where I was left.

18       Q.   And just dealing with the ability to consult

19  with counsel, did you think he had the ability on a

20  rational basis to consult with counsel?

21       A.   I didn't think so for a number of different

22  reasons.  I thought that, number one, he did not believe

23  that you were working in his best interest.  And it

24  wasn't just a question of like, well, you know, some of

25  the clients say, well, they just assigned me a public

1   defender and, you know, that's the prejudice against

2   that group.  It was more that you were actively involved

3   with the court in a conspiracy to undermine his ability

4   to represent himself and present a defense.  And I, you

5   know, I guess anything is possible, but I thought it was

6   highly unlikely.  So if that's what you think about your

7   lawyer, I don't know how you could consult with him

8   appropriately.

9           And I also thought that his conviction, that

10   he had a much better grasp of the situation legally than

11   you, or theoretically any lawyer that could be gotten

12   for him was problematic because he would always think

13   that he had a better idea.

14       Q.   After that evaluation, did you receive any

15   sort of correspondence from Mr. Mahoney?

16       A.   Actually I received some correspondence.  I

17   got it I think the day after or two days after I saw him

18   here the second time -- oh no, I did, I'm sorry, I got

19   one in between from him about his concerns about being

20   found incompetent.  And what I remember was on the front

21   of the envelope highlighted in yellow was thanks to you,

22   Dr. Mart, I'm still in jail or still incarcerated, which

23   I thought was something that might go inside the letter

24   would be more appropriate.

25       Q.   Did that correspondence you received from Mr.

1   Mahoney change your opinion with respect to his

2   competence or did it have any impact or relationship to

3   the competency determination you had made?

4          A.    I thought it was part -- it didn't surprise me

5   given his presentation.  I thought it was more evidence

6   of, the letter was rambling, I think I noticed that one

7   of the sentences had, you know, six lines, seven lines,

8   and it was difficult to follow, and once again,

9   referenced a lot of things that were difficult for me to

10  understand.

11         Q.    Did he allege you were part of this conspiracy

12  in that letter?

13         A.    I honestly don't recall.

14         Q.    Did you meet with Mr. Mahoney last month?

15         A.    I did.

16         Q.    And were you present in court when we had a

17  hearing before you met with him?

18         A.    Yes.

19         Q.    And you were able to witness Mr. Mahoney at

20  that time as he presented himself in court?

21         A.    I was.

22         Q.    Did you have any -- were you able to draw any

23  conclusions about how he presented himself in court that

24  day?

25         A.    I thought on that day that he seemed more

1   manic, incrementally more manic than he had the last

2   time I had seen him.  You know, some of these things

3   that you hear are hard to describe that he actually had,

4   and people here might notice he was actually having what

5   are called clang associations where one word gets used

6   in another way, I think there was something about the

7   chain of custody and it was sort of being conflated

8   with, you know, being incarcerated and the chain, you

9   know, like having a ball and chain, and there were a few

10  other instances of that and that can be evidence of --

11        THE COURT:  Chain of custody, yeah.  My

12  recollection was the concept of chain of custody, that

13  the concept of custody there properly applied is custody

14  of evidence handling that's presented at trial and Mr.

15  Mahoney was conflating with the idea of being in custody

16  for Fourth Amendment purposes or for Eighth Amendment

17  incarceration purposes, and I had the same observation.

18        THE WITNESS:  Right, exactly.

19        Q.   And after seeing him in the courtroom, did you

20  and I go meet with him in the holding cell down in the

21  marshal's office?

22        A.   Yes.

23        Q.   And did you have an opportunity to interview

24  Mr. Mahoney at that time?

25        A.   I did.

1      Q.    How long did that interview process take?

2      A.    I think it was 40 minutes.

3      Q.    Were you able to -- what did you observe

4    during that interview process or what conclusion did you

5    draw from it?

6      A.    It was similar to the last time only I thought

7    there was a little more pressure.  You know, he was

8    rapidly moving from -- although his attitude towards you

9    and towards the court was more positive at that point,

10   and he was talking about the fact that he would be happy

11   to have you represent him and, but he would also talk

12   about this issue of the Charlestown 7 and the current

13   case comes up a lot, and that there was talk about a

14   local judge and a civil suit, and I asked him about, I

15   said, look, what happens if you're competent, what

16   happens if you're incompetent, which one is better.  He

17   showed some ability, you know, particularly if you were

18   helping him focus on what was going to happen, but that

19   he was, you know, he started citing cases, talking about

20   the Interstate Commerce Clause, and he thought at that

21   point that, he reiterated that he thought he was more

22   experienced in sex offender registration law than any

23   lawyer who might represent him.  And he told me that

24   David Hilts and Attorney Pike were trying to correct

25   their mistake.  I wasn't sure what he meant.  But at

1  that time he did not seem to think there was a

2  conspiracy between the court and yourself.

3      Q.   Did Mr. Mahoney refer to a judge in Rochester

4  District Court during that meeting?

5      A.   Yeah, that's an example of what I was talking

6  about.  He was talking about the judge picking up a

7  document and talking about, it wasn't clear to me

8  whether he had or hadn't been convicted or was, you

9  know, I mean one of the things I guess I'm most struck

10 by it is that, you know, before someone, one of the

11 problems he would have in proceeding is just a lot of

12 the time I don't understand what he's saying, either

13 because it's going so rapidly or it's jumping around or

14 there's just unusual ideas involved.

15          THE COURT:  What's the term you used about

16 associations?

17          THE WITNESS:  Loose associations.

18          THE COURT:  Loose associations.  Thank you.

19     Q.   Was the reference, let me ask you this, you

20 were made aware before you did your first evaluation of

21 the basic elements of the case involving Mr. Mahoney?

22     A.   Yes.

23     Q.   When he started talking about the judge in

24 Rochester District Court, did that appear to you to be

25 related in any way to the case pending against him in

1   this court?

2        A.   Not that I could follow.  In other words,

3   there seemed to be -- that's what I mean by sort of

4   tangential thinking.  It goes from I was wrongly put on

5   a website and there is a judge and there was this other

6   thing, there is going to be a civil suit and everything

7   else, and I think that, without getting too much into

8   it, I think my understanding of the facts of the case,

9   what's actually being tried from you, is that it's

10  pretty straightforward, you know, were you there other

11  than the night of the 9th, not that there's five judges

12  in different situations involving trials and all kinds

13  of laws that may or may not apply.

14       Q.   Did he also talk about in that meeting that

15  took place in the holding cell, did he talk about some

16  sort of beating that took place in 2007?

17       A.   Right.  Yeah, he had also sent me pictures of

18  I think of his arm and his hand in a beating by police

19  that occurred when he had been brought in, and I really

20  wasn't -- once again, I couldn't connect that to what

21  was going on in his case.

22       Q.   Was that in your mind evidence of disordered

23  thinking?

24       A.   I think it goes along with that.  In other

25  words, he may very well have, you know, had a problem or

1    gotten injured in that situation, but I just couldn't, I

2    could not get the connection as to what it had to do

3    with any of this.

4         Q.   What was your opinion in terms of his

5    competence to stand trial at the end of that meeting?

6         A.   I said that it was a little less clear-cut for

7    me because I thought that he understands the system at a

8    certain level, you know, just as he did the first time

9    around, I think he understands the roles of the

10   participants, but I think he has problems with

11   decisional competence, in other words, being able to

12   look at the facts against you, the facts for you, the

13   strength of your case, to take the advice of your

14   lawyer, and then go forward on that basis.  And I think

15   that his thought processes about that are distorted and

16   that he had difficulties in those areas that would make

17   it very difficult for him to proceed.

18        Q.   So ultimately did you draw a conclusion about

19   competence to stand trial?

20        A.   I said -- I thought he was inclined to be

21   viewed he was incompetent to proceed and that, you know,

22   now he had the medications, and I don't know, you know,

23   one of the things, you know, if he's rapid cycling

24   that's always the possibility like, for example,

25   tomorrow he may be having a very good day, all right,

1   but the problem is is that you could schedule a hearing

2   and have a very different person show up for it.

3       Q.   The way he conducted himself here in the

4   courtroom today, what conclusions did you draw with

5   respect to his competence to stand trial based on that

6   observation?

7       A.   What I would say is, you know, look, I don't

8   like to conflate diagnosis with competence, but I think

9   at the point where you are in a full-blown manic

10  episode, and that's what I think I was observing, and

11  you know, I've seen him and I know what thought

12  processes tend to be associated with that, I don't think

13  when you're that acutely involved in that process that

14  you can really go forward.

15      Q.   And, doctor, did you also look at the issue of

16  whether or not, assuming Mr. Mahoney was found

17  competent, whether he's competent to represent himself?

18      A.   I don't think so.  I don't think that he could

19  stay on topic.  I don't think the jury would follow what

20  he was saying.  I don't think that he could present a

21  case that, you know, told a story A, B, C, and therefore

22  D, and I also think that he might become equally

23  agitated.

24      Q.   And you heard Dr. Kissin talk about in the

25  number of competency evaluations that are done, that the

1    vast majority come to a conclusion of competency?

2         A.   Yeah, I heard that.

3         Q.   Is that accurate?

4         A.   Well, you know, just coincidentally I'm

5    researching an article on the subject and the research

6    that I have seen mostly by Jennifer Skeem indicates this

7    wide variability, but in the sample they took which is

8    of several I think like in the Carolinas and a couple

9    other places, that the average incompetency rate is

10   36 percent of people referred to competency evaluations,

11   although they had some providers, one psychiatrist in

12   particular never found anybody incompetent, and that

13   some people found them up in the forties or fifties.  I

14   think actually there was somebody that was 60 percent.

15   I think there were a couple hundred providers.  It also

16   varies across disciplines.  Psychiatrists tend to find

17   people competent at a higher rate, social workers find

18   incompetence at the highest rate, psychologists are

19   somewhere in the middle, but one percent is an outlier.

20        Q.   And can you give the court any I guess reason

21   why there might be different determinations of

22   competency.  By different --

23        A.   Yeah, there's a recent study.  Personally if

24   it was up to me I think it's probably better just to

25   describe what you saw, and I think since it rests with

1  the court anyway, the ultimate issue, you know, somebody

2  would think, well, what does anybody care about what I

3  think about the ultimate issue, it's up to the court,

4  but I think it comes from different definitions that

5  clinicians have to themselves in what constitutes

6  competence or incompetence, and some people are more

7  conservative, some people are more liberal, some people

8  go into it more deeply and, you know, I think that's the

9  reason why people disagree.

10          MR. GARRITY:  I have no further questions.

11          THE COURT:  Okay.  I know you're going to

12  cross-examine, Mr. Huftalen.  Let me ask just a quick

13  definitional question before we move on.  I know I've

14  read in other psychological and psychiatric reports in

15  other cases that I've worked on either as a counsel or a

16  judge, the term racing thoughts.

17          THE WITNESS:  Yes.

18          THE COURT:  And it reminds me in some way of

19  this idea of pressured speech, but they're not the same

20  thing; right?

21          THE WITNESS:  They are very similar except one

22  is actually the way you're talking.

23          THE COURT:  Well, is pressured speech a

24  manifestation of either rapid cycling or racing thoughts

25  or something?

1               THE WITNESS:  It almost always is.  There are

2     some organic conditions that can cause it, too.  You're

3     talking fast because you're thinking fast.

4               THE COURT:  All right.  And Mr. Mahoney, he

5     thinks very fast.  He's intelligent but he also, his

6     minds sometimes appears to me, based upon what he is

7     saying, to be racing.

8               THE WITNESS:  Yes.

9               THE COURT:  Do you share that assessment?

10              THE WITNESS:  Absolutely.  I mean, it's

11    unusual for me not to be able to keep up with notes.

12              THE COURT:  Yup, all right.  Mr. Huftalen,

13    please proceed.

14              MR. HUFTALEN:  Dr. Mart, I don't have many

15    questions for you.

16              THE COURT:  Oh, okay.  I have a couple more

17    questions that I want to ask Mr. Mahoney.

18              MR. HUFTALEN:  I said I don't have many

19    questions.

20              THE COURT:  Oh, many.  I thought you said you

21    don't have any.

22              MR. HUFTALEN:  I'm sorry.

23              THE COURT:  Go ahead.

24                          CROSS-EXAMINATION

25    BY MR. HUFTALEN:

1      Q.    When you were talking about Mr. Mahoney

2   cycling, you talk about cycling fast, you can have a

3   good day or a bad day, schedule a hearing, you see one

4   person and then the next day see something else, in your

5   observations of Mr. Mahoney, would it be expected or

6   would you expect that Dr. Kissin and the people down at

7   Devens would not have seen him cycle over a six-week

8   period?

9      A.    I think it's quite possible.  I think that he

10   may have, you know, as time has passed he may have moved

11   into another phase of this.  You know, I mean, I take

12   them at their word that they didn't see this kind of

13   behavior.  But, you know, his behavior in court that I

14   observed is different than their description as behavior

15   at Fort Devens, so that suggests to me that maybe he

16   wasn't as manic when they saw him.

17      Q.    I'm not sure at what point during Dr. Kissin's

18   testimony you walked in the courtroom, but you've read

19   her report and you've heard at least part of her

20   testimony.  It seems to me that you guys disagree on the

21   ultimate opinion, but generally speaking, you don't

22   disagree with respect to most of the observational

23   aspects.  Is that right?

24      A.    I think so.  I suspect that he was not showing

25   such severity of symptoms at the time she saw him.  But

1   yeah, I would agree that basically, you know, I agree

2   with many of her conclusions.

3          THE COURT:  But your diagnosis is different.

4   You both diagnose different, to use your words, flavors

5   of bipolar; right?

6          THE WITNESS:  Yes.

7          THE COURT:  Bipolar II was her diagnosis and

8   your's was Bipolar --

9          THE WITNESS:  NOS with psychotic features.

10         THE COURT:  All right.

11      Q.   BY MR. HUFTALEN:  And that's the real

12   difference between your diagnosis and hers, the

13   psychotic features; correct?

14      A.   Yes, although I think that he's closer Bipolar

15   I, but Bipolar I doesn't include delusional thinking.

16      Q.   I'm sorry?

17      A.   Bipolar I doesn't include delusional thinking.

18         THE COURT:  Does not include delusional

19   thinking.

20      Q.   All right.  And you think that his thoughts

21   with respect to an alleged conspiracy between his

22   attorney and other people to get him is delusional in

23   nature?

24      A.   Yes.

25      Q.   Is it possible that it's just he sees the

1   facts differently than you and me and it's not the

2   technical or the psychological definition of delusional?

3        A.   Well, he said to me on more than one occasion

4   that the judge hearing this case and Attorney Garrity,

5   because of a specific case that they had in Superior

6   Court, were out to get him, to make his life difficult,

7   right, and I, you know, I think what we might be hung up

8   on here are this.  There are bizarre delusions and there

9   non-bizarre delusions, right?  Bizarre delusions would

10  be that my attorney is a werewolf, right?  Most believe

11  there aren't any, right?  A non-bizarre delusion is my

12  wife is having an affair and there's no factual basis

13  for that and there's no evidence of it, but I've

14  developed a fixed belief, so I think that I would

15  characterize those as non-bizarre delusions.

16       Q.   Mr. Mahoney made reference to a person named

17  David, I think he said Hilts, but I'll represent to you

18  that there's a David Hilts who is in the Attorney

19  General's Office, and David Hilts has been involved in

20  litigation with Mr. Mahoney over this issue of sexual

21  offender registration in New Hampshire, and I don't know

22  if you heard him talk about David Hilts and me, Arnie

23  Huftalen, being in cahoots together today which resulted

24  in the charges being brought against him.  Did you hear

25  him say that?

1          A.    I'm not sure.  I may have.

2          Q.    If you were to say that David Hilts and Arnie

3    Huftalen were working together and as a result of their

4    working together, I'll avoid collusive, but as a result

5    of working together I was charged in federal court with

6    failing to register as a sex offender, and if I were to

7    tell you that David Hilts handled independent litigation

8    in state court with respect to whether Mr. Mahoney was

9    appropriately listed on the sex offender web page and

10   has nothing to do with my case, would you describe his

11   comment about Mr. Hilts and myself working together as

12   delusional or just a misunderstanding on his part?

13         A.    I think it could easily be a misunderstanding.

14   I don't want to give the impression that everything that

15   Mr. Mahoney says is wrong, right?  In some cases it may

16   just be that I'm not able to follow it or have

17   sufficient background to all this.  But that could

18   easily just be, you know, these two guys are working

19   together, I think they are both, they don't like me and

20   that's why they are doing this, they have a particular

21   animus against me.  That might be wrong but that

22   wouldn't necessarily be delusional.

23         Q.    I wasn't sure I understood your testimony with

24   respect to the judge in Rochester holding a paper up.

25   Is it your opinion that his comments about the judge in

1   Rochester were delusional or that was just him taking

2   issue with another person in the judicial arena?

3      A.   The reason I brought that up was because he

4   was trying to explain to me and I could not follow the

5   explanation.   In other words, he was talking about the

6   judge holding up a paper, and then he would go on to

7   explain why that was significant, and I just couldn't

8   get why that was a problem, and whether it was a good

9   thing for him or a bad thing for him or if it had

10   anything whatsoever to do with what we were talking

11   about.

12      Q.   You said that you think, at one point at least

13   you said you think that he understands the system but

14   has a problem with decisional competence?

15      A.   Yes.

16      Q.   We could probably agree that we each know a

17   lot of people who have problems with decisional

18   competence in the vernacular, but is that a sliding

19   scale, and if it's a sliding scale, where do you draw

20   the line and say that's a mental disease or defect that

21   makes him incompetent?

22      A.   Well, I wouldn't say that frankly.   What I

23   would say is I think this person's ability to do

24   something is impaired and I think it's impaired enough

25   that they can't proceed, and the delusional part is just

1  explanatory.  And the reason for that is that he's got

2  X, Y or Z condition.

3      Q.  I apologize, I misunderstood you.  When you

4  started to say that at one point in time at least you

5  thought he understood the system, but he had a problem

6  with decisional competence, I thought you were saying

7  but for the problem of decisional competence, perhaps I

8  might find him to be competent.

9      A.  I thought in my second report I said I thought

10 that was where the problem lay, that he's got deficits

11 in decisional competence.

12     Q.  And do you see that necessarily tied to

13 Attorney Garrity or do you think that that's an

14 overarching problem Mr. Mahoney has and would have with

15 other lawyers as well?

16     A.  I think it's a broader problem.  I don't think

17 it's just his thoughts, which wax and wane about

18 Attorney Garrity.  I think it has to do with his

19 decisions like, well, would I be better off having a

20 lawyer or not having a lawyer.  I want to be clear.

21 Someone, I think you pointed this out, could make that

22 decision and just be wrong, show poor judgment, and you

23 know, that's just the way it goes, you probably should

24 have had a lawyer, you decided you would do it yourself,

25 doesn't necessarily make you competent or incompetent to

1  represent yourself.  But I think that he has difficulty

2  taking the facts and weighing them in a rational manner

3  that would allow him to understand the process well

4  enough to proceed.

5          MR. HUFTALEN:  Thank you very much.  Your

6  Honor, I have no other questions.

7          THE COURT:  All right.  Does Doctor, what was

8  her name, Kissin, she defined delusion.  Does delusion

9  have a different definition in, say, psychiatric field

10  DSM than it does in the dictionary, English usage?

11          THE WITNESS:  Broadly, no.  I think that

12  psychologists and psychiatrists kind of slice and dice

13  it up a little bit more, talk about different kinds, but

14  it means believing something that's not factually true

15  and not just because of a mistake but because of some

16  kind of problem in the process.

17          THE COURT:  Okay.  All right.  Now, I want you

18  to stay on the stand.  I have a couple questions for Mr.

19  Mahoney and possibly for counsel.  Of course defense

20  counsel, if you don't want Mr. Mahoney to answer any

21  question I ask him, then you advise him not to and he

22  doesn't have to, so bear that in mind.

23          MR. GARRITY:  Yes.

24          THE COURT:  Mr. Mahoney, I asked you during

25  the other doctor's testimony if you were under the

1    impression or belief that your lawyer, Mr. Garrity, was

2    involved in a conspiracy with the prosecutor against

3    your interests and you told me you thought that they

4    were.

5             THE DEFENDANT:  At that time I did, your

6    Honor, I did because of the facts of the case that I got

7    after Dr. Kissin gave me the report which indicated that

8    I did not know about, and so late in July it was the

9    fact that these two gentlemen had actually spoken on the

10   issue --

11            THE COURT:  So you thought they had

12   information that they hadn't shared with you?

13            THE DEFENDANT:  They did not share at that

14   time, judge, no, they didn't.  But to ask a doctor --

15            THE COURT:  Wait, wait, let me ask a question.

16   I want to work through this.

17            THE DEFENDANT:  Okay.

18            THE COURT:  And I asked you whether you were

19   still under that belief and you told me yes, you are.

20            THE DEFENDANT:  Well, I mean, judge, when

21   looking at a case here --

22            THE COURT:  Wait a minute.  You don't have to

23   justify it, I'm just asking if that's what your belief

24   is.

25            THE DEFENDANT:  I think this looking at a

1   case, you know, got way out of control.  I think when I

2   was put on the web page as I explained to you,

3   immediately I went and filed a civil suit which I

4   dropped recently, by the way, because I think it's more

5   important, freedom is a price like you can't get.  I

6   didn't get into this to lose my freedom.  I got into

7   this to prove one thing, aggravated felonious sexual

8   assault, and I was put on the web page for an aggravated

9   rape, which is a factual because both of those --

10          THE COURT:  I understand that.  I just need a

11   few answers to a few questions.

12          THE DEFENDANT:  I just think it was

13   misinformation, I should use the word instead of

14   conspiracy, because again, I think Mr. Garrity has been

15   with me the whole time for this whole process and of

16   course trying to get back to society I'm trying, one

17   thing I can say, both doctors, they never stated that I

18   never understood the natures and consequences --

19          THE COURT:  I understand all that.  Hold it.

20   Let me ask some more questions because I want to get

21   through some of your opinions and ask the doctor.

22          There has been some talk in the case that you

23   had the belief that your lawyer and myself, when I was a

24   prosecutor, engaged in some conspiratorial conduct

25   against Mr. Belton.

1          THE DEFENDANT:  If I can be --

2          THE COURT:  Let me ask, do you remember that?

3          THE DEFENDANT:  I have cited case law, yes,

4    sir, I do, sir.

5          THE COURT:  All right, I remember the case

6    too, by the way.

7          THE DEFENDANT:  But I'm not saying it was

8    anything illegal.

9          THE COURT:  You don't need to, I just -- I

10   have two questions about that.  Are you still under that

11   impression?

12         THE DEFENDANT:  No, I'm not under that

13   impression anymore, judge, because he was guilty

14   obviously.  I just think when you made him a plea offer

15   I think Mr. Garrity should have told Mr. Belton because

16   I believe he had a brain aneurysm if I'm not mistaken.

17         THE COURT:  I can assure you of a couple

18   things.

19         THE DEFENDANT:  Okay.

20         THE COURT:  One, that that offer was made to

21   Mr. Belton.  Two, that Mr. Garrity did convey it, and I

22   think we both thought it was a very good idea that he

23   would have taken it, but he didn't.  That said, okay, do

24   you think that interaction between Mr. Garrity and

25   myself, conspiracy or not, does that impact you in some

1    way?

2              THE DEFENDANT:  Well, it did and it doesn't

3    now.  It did in the beginning because when I plugged

4    into the query, I saw ineffective counsel and the first

5    thing that pops up is that case.  Now this gets me

6    saying wait a minute.  I see prosecutor Laplante, and

7    that's the case, the very first case when I plugged it

8    into the computer at Strafford County turns up

9    ineffective counsel.  I was under the impression, then I

10   saw your name, and I says the judge, how could a judge

11   normally appoint me an attorney that he had been with

12   that maybe had ineffective assistance of counsel before.

13   And it wasn't the case law, it was just the answer 113.

14             THE COURT:  If I understand what I read, what

15   you thought happened was I must have picked your lawyer

16   on purpose to get to get you --

17             THE DEFENDANT:  Knowing at that particular

18   point, judge, and of course I can't be a hundred percent

19   because I do remember because I'm very, very smart with

20   the law, I do remember you saying Jeff Levin is a good

21   attorney.  If I give you another attorney, he's not

22   going to be as good as Jeff Levin.  Well, Jeff Levin has

23   to deal with another client named Brian Mahoney which my

24   whole record had been brought forward with Judge

25   McCafferty.  Not one word talked about me.  And this is

1    what I'm being held on and I think at that point when

2    you look at it, every time a defense lawyer takes time

3    is the first thing he should do is go to the First

4    Circuit Court of Appeals and raise the issue of bail,

5    and Mr. Garrity never did, and he never did, I don't

6    know why, but I thought that should have been an issue,

7    and I've been held now 17 months and I'd like to go

8    home.

9              THE COURT:  All right, now, all right, I

10   understand I think.

11             THE DEFENDANT:  That's what I was looking at.

12             THE COURT:  So you had the idea based on

13   seeing all these things.

14             THE DEFENDANT:  I just plugged in ineffective

15   counsel and I see you.  I didn't know you were a

16   prosecutor.  I said this is my opinion based only on my

17   opinion that you just recently became a judge between

18   2008 and present, so you just became a judge, that's my

19   opinion, because it looked like your cases go back

20   almost 24 years as a prosecutor.

21             THE COURT:  All right, so your thought was

22   that I must have given you a lawyer that wouldn't serve

23   your best interest on purpose.

24             THE DEFENDANT:  I thought because of the fact

25   that I did see David Hilts on February 18th when he was

1   here at my hearing when I was firing Levin, and also

2   some of the Department of Safety people were here, I

3   think what we have in this case, judge, between

4   Massachusetts and the Department of Safety, there was

5   definitely some miscommunications.  There was some

6   definitely wrongdoing to me that shouldn't wound up

7   having me be present in a federal court when no federal

8   laws were actually broken.

9           THE COURT:  Okay, you anticipated one of my

10   questions a minute ago.  You mentioned Mr. Levin,

11   Attorney Levin.

12           THE DEFENDANT:  Yes.

13           THE COURT:  And I remember in February of 2011

14   Mr. Levin filed a motion saying that we should have a

15   hearing and you wanted to go pro se.

16           THE DEFENDANT:  I wanted to, I didn't want to

17   use Mr. Levin's motion to dismiss because if you look at

18   it he parroted Attorney Levin -- excuse me, Huftalen, he

19   parroted that Mr. Mahoney is required to register on

20   a --

21           THE COURT:  All right, I just need you to

22   explain to me, though.

23           THE DEFENDANT:  Yes.

24           THE COURT:  So you were dissatisfied with

25   Attorney Levin for what reason?

1          THE DEFENDANT:  The reason that he had filed a

2    motion to dismiss that said Mr. Mahoney is required to

3    register as a sex offender for a February 12, 1982

4    charge and conviction September 23rd, 1983, and I

5    remember perfectly, judge, before I even met you, I met

6    Paul, Attorney Garrity.  I said Mr. Attorney Garrity, if

7    Arnie Huftalen mentioned September 23rd, 1983, not only

8    did we have an appeal with that case, that case is still

9    a very active case.  In 2005 my second appeal was

10   denied, but it was not deemed, the certificate of

11   forfeiture was required by the Massachusetts --

12         THE COURT:  All right, I'm just trying to

13   understand.  So there was something about what Levin did

14   that made you think he wasn't serving your best

15   interest.

16         THE DEFENDANT:  Well, what Levin did was he

17   said I was required to register as a sex offender, and

18   that's just not true for the 1982 case.

19         THE COURT:  But he was moving to dismiss your

20   case.

21         THE DEFENDANT:  He tried to dismiss it but

22   when I saw -- my roommate in Strafford County back then

23   --

24         THE COURT:  Wait a minute.  When you saw that

25   he said you had to register in the eighties, that upset

1   you and you thought I got to get a new lawyer.

2           THE DEFENDANT:  No, it goes back to he had the

3   other Brian Mahoney.

4           THE COURT:  Oh.

5           THE DEFENDANT:  That's the conflict of

6   interest right there.  That was my roommate in Strafford

7   County in 2006 by the way.  And as a matter of fact,

8   what I was told specifically, Jeffrey Levin wouldn't get

9   off the Brian Mahoney case unless the family hired

10  another one.  I went and hired Mark Sisti just to get

11  rid of Levin back in 2006 in June.  So I thought there

12  was a conflict, basically Jeff Levin having two Brian

13  Mahoneys when my case wasn't incorporated with the other

14  Brian Mahoney, that they actually held me on --

15          THE COURT:  Now, Mr. Huftalen, you had some

16  conversations with Attorney Levin, I assume, at the time

17  when he moved for status of counsel and he was removed

18  from the case and Mr. Garrity was appointed.  What's

19  your recollection of what transpired there?

20          MR. HUFTALEN:  Well, as the court knows Mr.

21  Levin is very careful not to violate attorney/client

22  privilege in that case and he didn't in this case.

23          THE COURT:  Of course.

24          MR. HUFTALEN:  He implied to me that Mr.

25  Mahoney felt that Mr. Levin had sold him out and that he

1  had somehow agreed with the government with respect to a

2  material fact that he should not have.  Hearing Mr.

3  Mahoney speak now, that makes sense --

4         THE COURT:  That makes sense.

5         MR. HUFTALEN:  But I didn't know the

6  particulars at the time.

7         THE COURT:  Okay.

8         THE DEFENDANT:  Because the first felony

9  charge, judge, was 22050, whoever is required to

10 register, and there are so many, but October 31, 1994,

11 above that you have to register.  Anything prior --

12        THE CLERK:  Slow down, Mr. Mahoney.

13        THE DEFENDANT:  Anything prior before that, if

14 you sentence him, your probation and incarceration is

15 completed because --

16        THE COURT:  I understand all that, I do.

17        THE DEFENDANT:  That case, that's Hartley

18 versus the Attorney General of New Hampshire.

19        THE COURT:  Dr. Mart, Dr. Mart, my question

20 for you is this, and draw on what you heard to the

21 extent you feel necessary or advisable.  I'm wondering

22 about the impact of delusions, bizarre enough, just

23 delusional thinking about defense counsel's conduct and

24 how it might effect other factors that pertain to

25 competency.  In other words, for lack of a better word,

1   to labor under the delusion, it appears to me repeatedly

2   that counsel is acting against your best interest, I

3   wonder how it affects the mania, I wonder how it affects

4   the emotional, the anxiety level and some of the things

5   you talked about.  How can that impact competency and a

6   number of factors that inform competency.

7              DR. MART:  The delusional belief?

8              THE COURT:  Yeah, this delusional belief.  The

9   one we're talking about now.

10             DR. MART:  Well, I think it, I think it's part

11  of a larger picture, right.  I was listening carefully

12  to that.

13             THE COURT:  Yeah.

14             DR. MART:  If you think about the structure of

15  what Mr. Mahoney was just saying, right, he has Attorney

16  Garrity.  He looks up attorney misconduct or poor

17  representation, right, finds a case where ineffective

18  assistance of counsel, where he was the defense attorney

19  and you were the prosecutor, right.

20             THE COURT:  Right.

21             DR. MART:  Okay, now, what would be logical.

22  Well, maybe Attorney Garrity is not such a good lawyer

23  would be one conclusion somebody could draw from that

24  information.

25             THE COURT:  Maybe, of course that was never

1   established.

2            DR. MART:  I'm not implying that, I'm just

3   saying if you're sitting at your computer in Strafford

4   County.

5            THE COURT:  Okay.

6            DR. MART:  How does it follow that you would

7   have an interest in appointing him an attorney who would

8   not do a good job representing him?  In other words, I

9   understand why on the face of that he would have

10  mistrust of Attorney Garrity.  What do you have to do

11  with that?

12           THE COURT:  You're telling me about how he

13  might have delusion, some sort of flawed thinking.  That

14  I'm persuaded about.  I'm wondering how that affects

15  everything else.  To be competent to stand trial you've

16  got to assist counsel.

17           DR. MART:  Right.

18           THE COURT:  And two things, you know, one,

19  there's the problem of consistently perceiving counsel

20  as working against your best interest.  That's more

21  often or not based on a delusion.  And then what that

22  does to the rest of your emotional and mental state.  It

23  seems to me to be a very difficult set of conditions for

24  a defendant to operate under to have this belief, this

25  delusional belief, bizarre or not, that his counsel is

1    acting against him.  It could affect his, you know, it

2    could affect a number of things, it just seems to me to

3    be a trigger.

4              DR. MART:  You know, it's interesting, I will

5    make this very brief.  I had a conversation with a well

6    known psychologist out in Arizona, Joe Boskin, and he

7    said one of the problems is that when you start looking

8    at one thing, you know, you look through the lens of

9    delusion you don't think about the other things.  In an

10   example he said why do people who are diagnosed with

11   schizophrenia kill themselves at such a high rate, you

12   know, he said why is that.  He said because they are

13   depressed, because it sucks to be schizophrenic, right,

14   but because we're looking at people who have

15   schizophrenia, you don't think about the fact that there

16   are people who also get depressed about their situation,

17   and you're absolutely right.  I think that if he's got

18   this idea that he can't get a fair shake, and that

19   people who he should be able to trust and depend on are

20   against him, that would raise his anxiety level and

21   could very well make him start, you know, thinking

22   faster, being more anxious, and one thing leading to

23   another.

24             THE COURT:  All right.  Thank you.  All right.

25   Any follow-up questions for the doctor?

1           MR. GARRITY:  No.

2           MR. HUFTALEN:  I don't have any questions but

3   may I say something to the court?  I'm not sure what the

4   court's intention is right now with respect to moving

5   forward and ruling on these issues, but if the court is

6   inclined, I would request that the court take this

7   matter under advisement at least for a day or two

8   because I'd like the opportunity to submit to you a

9   memorandum that at least addresses the statutory options

10  under 4241 that are presented in this case.

11          THE COURT:  Sure, it was my plan to take it

12  under advisement anyway.

13          MR. HUFTALEN:  Thank you.

14          THE COURT:  All right, you can stand down.

15          DR. MART:  Thank you.

16          MR. SCHULMAN:  Judge, I have a procedural

17  issue, is that I see that there's a trial scheduled for

18  May 1st.

19          THE COURT:  Yes.

20          MR. SCHULMAN:  I have a civil jury trial and a

21  conflict with the May 1st date, and at this point I'm

22  just apprising the court of that now.

23          THE COURT:  What court is the civil trial in?

24          MR. SCHULMAN:  The civil trial is in

25  Rockingham County, been on the list for quite some time.

1   It is a co-counsel case, and in fairness, I'm new to the

2   co-counsel case, and as I say at this point I'm simply

3   alerting the court to a scheduling conflict.

4           THE COURT:  I appreciate that.

5           MR. SCHULMAN:  The other thing I should

6   probably say in open court with Mr. Mahoney here so that

7   the air is clean from this point forward, I too have

8   been on the other side of cases with your Honor, two

9   murder cases in state court and a couple of cases here

10  when your Honor was a prosecutor.  I want to make sure

11  Mr. Mahoney --

12          THE COURT:  He knows that.

13          THE DEFENDANT:  That's understood.  I was just

14  putting in ineffective counsel and that's the only thing

15  that popped up.  Again, I think really, judge, what I

16  really would like to do, and we have already stressed

17  the point, and we do have two and of course if we need

18  three, is the fact that I really want to find closure in

19  this issue and register to the charge that I have on

20  9/23/1983, we haven't addressed.

21          THE COURT:  So you're saying, I want to say

22  right now before I ask a question, whatever the answer

23  to this question is, it will never be used against him.

24  You're trying to tell me, there's been some discussion

25  that you would like to plead guilty under the right

1   conditions.

2          THE DEFENDANT:  That is the deal today, judge.

3   In fact I could be going home today at 17 months --

4          THE COURT:  Let me give you my thoughts on

5   this.  I wasn't willing to -- there's the issue of

6   whether you're competent to enter a guilty plea and I

7   think I have an opinion on that.  That said, if you

8   were, it would not be living up to my obligations to the

9   public and to you, really, to simply let you walk out of

10  this place today.  When people are incarcerated and they

11  are freed immediately, it puts them in a very vulnerable

12  position and puts the public in a vulnerable position.

13  So, I haven't expressed any inclination against the

14  arrangement you worked out, but the transition needs to

15  be much better planned out, much better planned out, and

16  I need assurances about it's going in an orderly way

17  that protects you and protects the public.

18          Now, that said, here's my thoughts based on

19  what I heard today.  These are preliminary thoughts.

20  I'm going to take the matter under advisement.  I'm

21  going to appoint Attorney Schulman as co-counsel.  I

22  hope you appreciate that.  He's a very good lawyer, much

23  like Mr. Garrity, very experienced.

24          THE DEFENDANT:  Thank you.

25          THE COURT:  My, these are not rulings, they

1   are sort of preliminary leanings and I just want counsel

2   to be aware of and Mr. Mahoney to be aware of.  I do not

3   think Mr. Mahoney is competent to proceed to trial pro

4   se.  In other words, I don't think he's competent to

5   represent himself pro se at trial for a number of

6   reasons, mostly -- I think he's better versed in the law

7   than a lot of people, a lot of lawyers.

8             THE DEFENDANT:  I get emotional, you know.

9             THE COURT:  It's emotional.  The problem is

10  containing the emotions and racing thoughts and

11  pressured speech.  I think it could make it very, very

12  difficult for you to make a presentation to a jury in a

13  way they could appreciate and not simply tune you out.

14  But that's just a very preliminary sort of finding.  I

15  do think, based on everything I've read and seen, that

16  you are very likely competent to enter a plea.  And

17  because I think, you know, to use the MacArthur

18  language, I can't apply the MacArthur scale, but to use

19  that language, you do seem to have in the first and

20  second Axis, very good understanding and very good

21  reasoning, and on the appreciation point number three,

22  based on what I've read and heard I think with respect

23  to the consequences of a plea and how it affects you, I

24  think you probably are pretty well positioned.  Again,

25  that's very preliminary.

1          The third one is the question of competency to

2     stand trial, which would be the ultimate decision, if

3     you went to trial.  That's a closer call.  I feel pretty

4     confident about the first two things I've preliminarily

5     indicated.  The third one, very much under advisement in

6     my mind, and it would require more thought and

7     consideration and some research by me, but I appreciate

8     everybody's presentations, including yours, Mr. Mahoney.

9          So, the matter is under advisement.  We are

10    scheduled for trial in May.  That said, I assume that

11    you will continue to do your jobs as we proceed.  And

12    you wanted to file something?

13         MR. HUFTALEN:  Yeah, I thought of it when Mr.

14    Schulman talked about the trial he was scheduled for.  I

15    mean, I also have conflicts and I know that you won't

16    find my conflicts in 3161, speedy trial rights, but if

17    we end up having to go to trial, I will be advising the

18    the court that I'm a computer prosecutor and we have an

19    annual conference of computer prosecutors once a year,

20    it happens to be scheduled for that week, and I'm asked

21    to speak on Tuesday and Wednesday and Thursday of that

22    week at that conference, but I'll deal with counsel on

23    my conflict issues.

24         THE COURT:  And to me that's an office

25    staffing issue.  This seems like a case that while I

1    think we'd all benefit from your expertise in this area,

2    and certainly you're very well versed in it, a failure

3    to register case seems like a case that could be handled

4    by other people, if necessary, in the office, right?

5              THE DEFENDANT:  Well, I object to that, judge,

6    this is a federal failure which involves interstate

7    commerce travel.

8              THE COURT:  I know, but he's got an office

9    full of federal prosecutors.

10             THE DEFENDANT:  I understand that, judge, I

11   just want the federal court know this is not just

12   failure to register.

13             THE COURT:  No, you're absolutely correct.

14             THE DEFENDANT:  And I'm being held still, and

15   I have not committed another crime in that nature in

16   31 years.

17             THE COURT:  And I will repeat to you what I've

18   said to you once today.  I do not want you to be

19   incarcerated, either civilly or criminally, for a minute

20   longer than is required by law, and I mean it, all

21   right?

22             We are in recess.  The matter is under

23   advisement.  Keep me apprised.

24             (Court adjourned at 6:20 p.m.)

25

137

```
 1                    C E R T I F I C A T E

 2

 3            I, Sandra L. Bailey, do hereby certify that

 4    the foregoing transcript is a true and accurate

 5    transcription of the within proceedings, to the best of

 6    my knowledge, skill, ability and belief.

 7

 8

 9    Submitted: 8/3/12

10                         _____

11                         SANDRA L. BAILEY, LCR, CM, CRR

12                         LICENSED COURT REPORTER, NO. 15

13                         STATE OF NEW HAMPSHIRE

14

15

16

17

18

19

20

21

22

23

24

25
```